Delores **RUDD** and Charlotte
Walker, Appellees,

v.

The Honorable Robert D. **RAY**, Governor
of the State of Iowa, et al., Appellants.

No. 2–59035.

Supreme Court of Iowa.

Dec. 15, 1976.

Richard C. Turner, Atty. Gen., Stephen C. Robinson, Special Asst. Atty. Gen., and Michael P. Murphy, Asst. Atty. Gen., for appellants.

Gordon E. Allen, Des Moines, and Gordon M. Liles, Fort Madison, for appellees.

HARRIS, Justice.

This is a taxpayer's derivative suit challenging the constitutionality of legislation which provides for salaried chaplains and religious facilities at the state penitentiary.

The challenge is grounded on both federal and state constitutions. The trial court held the legislation does not offend the federal constitution but does offend the state constitution. Accordingly the trial court enjoined the use of public funds for such purposes. We believe the legislation violates neither constitution. We reverse the trial court and remand for dissolution of the injunction.

The facts can be simply stated. Plaintiffs are taxpaying citizens of the State of Iowa. Under authority given by statute the Iowa State Penitentiary: (1) employs two full-time chaplains (one Protestant, one Catholic) at annual salaries totaling $25,000, (2) employs a part-time chaplain at a salary of $216 monthly, (3) expends other funds in relation to chapel activities at the penitentiary. Separate chapel areas are reserved in a previously vacant industrial building for Catholic and Protestant congregate worship. Another group, calling themselves the Church of the New Song, utilizes the prison auditorium and also has office and meeting space elsewhere in the penitentiary.

The chaplains at the penitentiary are ordained clergymen who have received advanced training concerning institutional settings and counselling. They provide sectarian services. The Protestant services are general in nature. The Protestant chaplains provide service for inmates of all religious persuasion, including "minority religions." Attendance by the prisoners at all services is purely voluntary. The chaplains provide substantial counselling service. Counselling is done on both a group and individual basis, at set times or on a crisis basis.

I. The trial court held providing for state supported chaplains and religious facilities does not violate the establishment clause of the First Amendment to the United States Constitution. Plaintiffs appeal from this portion of the trial court's ruling.

The First Amendment to the United States Constitution states "Congress shall make no law respecting an establishment of

religion, or prohibiting the free exercise thereof * * *." The establishment and free exercise clauses of the First Amendment apply to legislation promulgated by states. *Committee for Public Education & Religious Liberty v. Nyquist*, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973); *Presbyterian Church in United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969); *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). The establishment and free exercise clauses are related aspects of the constitutional scheme for church-state relations. The twin aspects have been described as follows:

"The constitutional inhibition of legislation on the subject of religion has a double aspect. On the one hand it forestalls compulsion by law of the acceptance of any creed or the practice of any form of worship * * *. On the other hand, it safeguards the free exercise of the chosen form of religion * * *. The interrelation of the 'establishment' and 'free exercise' clauses has been well summarized as follows: 'The structure of our government has, for the preservation of civil liberty, rescued the temporal institutions from religious interference. On the other hand, it has secured religious liberty from the invasion of the civil authority.'" Annot., 37 L.Ed.2d 1147, 1157 (1974). See also *Everson v. Board of Education*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1946).

Because the two aspects are to some extent competing the United States Supreme Court has long struggled over their separate definitions and the difficulties of properly balancing them. In *Everson*, supra, 330 U.S. at 15–16, 67 S.Ct. at 511, 91 L.Ed. at 723, appears the following explanation:

"The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against

his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa. In the words of Jefferson, the clause against establishment of religion by law was intended to erect 'a wall of separation between Church and State.' (Authority)."

Decisions in succeeding decades have taught varied lessons on the subject. In *Nyquist*, supra, 413 U.S. at 771–772, 93 S.Ct. at 2964, 37 L.Ed.2d at 962, the following lines were drawn:

" * * * It is enough to note that it is now firmly established that a law may be one 'respecting an establishment of religion' even though its consequence is not to promote a 'state religion,' (Authority), and even though it does not aid one religion more than another but merely benefits all religions alike. (Authority). It is equally well established, however, that not every law that confers an 'indirect,' 'remote,' or 'incidental' benefit upon religious institutions is, for that reason alone, constitutionally invalid. (Authorities). What our cases require is careful examination of any law challenged on establishment grounds with a view to ascertaining whether it furthers any of the evils against which that Clause protects. Primary among those evils have been 'sponsorship, financial support, and active involvement of the sovereign in religious activities.' (Authorities)."

Drawing from what it described as "the full sweep of the establishment clause cases" the United States Supreme Court in *Nyquist*, supra, laid down a three part test for determining whether laws which aid religious institutions violate the clause:

" * * * [T]o pass muster under the Establishment Clause the law in question

first must reflect a clearly secular legislative purpose, (Authority), second, must have a primary effect that neither advances nor inhibits religion, (Authorities), and, third, must avoid excessive government entanglement with religion, (Authorities)." 413 U.S. 773, 93 S.Ct. at 2965, 37 L.Ed.2d at 962–963. See generally 16 C.J.S. Constitutional Law § 206(1), pp. 1017–1030; 16 Am. Jur.2d, Constitutional Law, §§ 336–340, pp. 645–657.

■ Plaintiffs argue the challenged legislation violates all three parts of the *Nyquist* test and thus runs afoul of the establishment clause. The argument has force but ignores the companion free exercise clause with which the establishment clause must be balanced. The free exercise clause prohibits the making of a law which in any way interferes with the free exercise of religion. The prohibition extends to unorthodox as well as orthodox religious beliefs and practices. It extends to religious organizations and individuals. It denies the government any power to proscribe, regulate, favor directly or indirectly any particular religious beliefs or doctrines (though not necessarily the acts which citizens may feel called upon to perform in compliance with their religious views). See Annot., 37 L.Ed.2d 1147, 1170 (1974); *School District of Abington Township v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).

The crucial and controlling fact in this case is that it deals with the exercise of religion by prison inmates. Prison inmates are restrained and consequently deprived of their liberty. By reason of their status they are displaced from their homes and communities. They are thereby denied the opportunity to exercise their individual rights to worship in the same manner as could an ordinary citizen.

■ It is clear prisoners retain some rights to religious freedom. See Annot., 12 A.L.R.3d 1276, 1278 (1967):

"While the law in this area is still (1967) in a state of development, it is now established that prisoners do have certain rights and privileges in the religious area which the courts will protect and that the prison authorities may not punish or discriminate against religious beliefs as such. * * *." See *Cruz v. Beto*, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); *Theriault v. Carlson*, 339 F.Supp. 375 (1972); *Gittlemacker v. Prasse*, D.C., 428 F.2d 1 (3 Cir. 1970); *Cooper v. Pate*, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964); Annot., 37 L.Ed.2d 1147, 1159 (1974). A prisoner's retained rights of religious freedom include some reasonable opportunity to exercise their religion. In *Cruz*, supra, 405 U.S. at 322, 92 S.Ct. at 1081, 31 L.Ed.2d at 268 n. 2, it is stated:

"We do not suggest, of course, that every religious sect or group within a prison—however few in number—must have identical facilities or personnel. A special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand. But reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendments without fear of penalty." See also *Theriault*, supra; *Gittlemacker*, supra; *O'Malley v. Brierly*, 477 F.2d 785, 796 (3 Cir. 1973).

The question becomes whether the enhancement of the free exercise clause by state-provided chaplains and religious facilities nevertheless violates the establishment clause. The few cases which have addressed the question seem to agree with our conclusion it does not. *Remmers v. Brewer*, D.C., 361 F.Supp. 537, 543 (1973); *Theriault*, supra; *Horn v. People of California*, D.C., 321 F.Supp. 961, 964 (1968). Our view was capsulized by Mr. Justice Brennan in a concurring opinion in *School District of Abington Township*, supra, 374 U.S. at 296–299, 83 S.Ct. at 1610–1612, 10 L.Ed.2d at 900–902:

"There are certain practices, conceivably violative of the Establishment Clause, the striking down of which might seriously interfere with certain religious liberties also

protected by the First Amendment. Provisions for churches and chaplains at military establishments for those in the armed services may afford one such example. The like provision by state and federal governments for chaplains in penal institutions may afford another example. It is argued that such provisions may be assumed to contravene the Establishment Clause, yet be sustained on constitutional grounds as necessary to secure to the members of the Armed Forces and prisoners those rights of worship guaranteed under the Free Exercise Clause. Since government has deprived such persons of the opportunity to practice their faith at places of their choice, the argument runs, government may, in order to avoid infringing the free exercise guarantees, provide substitutes where it requires such persons to be. * * *.

" * * *.

"The State must be steadfastly neutral in all matters of faith, and neither favor nor inhibit religion. * * *. On the other hand, hostility, not neutrality, would characterize the refusal to provide chaplains and places of worship for prisoners and soldiers cut off by the State from all civilian opportunities for public communion, * * *." See also Annot., 12 A.L.R.3d 1276, 1278 (1967); 60 Am.Jur.2d, Penal and Correctional Institutions, § 46, pp. 852–854.

Our holding is consistent with the rule the government must be neutral and not hostile to religion. See *Zorach v. Clauson*, 343 U.S. 306, 312–313, 72 S.Ct. 679, 683, 96 L.Ed. 954, 961–962 (1952); *Everson*, supra; *McCollum v. Board of Education*, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948); *School District of Abington*, supra; *Gillette v. United States*, 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971).

■ The prohibition of the establishment clause is not absolute. This is illustrated by the following examples of governmental actions which benefit religion without violation of the establishment clause: (1) the use by religious organizations of civil courts. *Maryland & Virginia Eldership of Churches of God, Inc. v. Church of God, Inc.*, 396 U.S. 367, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970);

*Mary Elizabeth Blue Hull Memorial Presbyterian Church*, supra, (2) the exemption of property used for religious purposes from taxation. *Walz v. Tax Com. of New York*, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), (3) the Sunday closing or "blue" laws, *McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); *Gallagher v. Crown Kosher Super Market*, 366 U.S. 617, 81 S.Ct. 1122, 6 L.Ed.2d 536 (1961); *Two Guys from Harrison-Allentown, Inc. v. McGinley*, 366 U.S. 582 81 S.Ct. 1135, 6 L.Ed.2d 551, (1961). See generally 81 C.J.S. States § 139, pp. 1171–1172; 63 Am.Jur.2d, Public Funds, § 73, pp. 462–463.

■ From the foregoing we conclude there is no violation of the First Amendment to the United States Constitution by the action of the state in providing chaplains and religious facilities to prisoners. Any claim of offense against the establishment clause is balanced by its justification under the free exercise clause. The trial court was correct in so ruling.

II. Plaintiffs alternatively claim the provision for chaplains and religious facilities violates Art. I, § 3 of the Iowa Constitution. That provision states:

"The General Assembly shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; nor shall any person be compelled to attend any place of worship, pay tithes, taxes, or other rates for building or repairing places of worship, or the maintenance of any minister, or ministry."

■ Our task is to determine the meaning of this provision. The framers of our constitution necessarily gave us their ideas in the words they agreed upon. But words at best are mere messengers of the thoughts and ideas they are sent to convey. When words are enshrined in a governmental charter, so as to speak across centuries, their history, purpose, and intended meaning must be closely examined. In *Ex Parte Pritz*, 9 Iowa 30, 32 (1859), we said:

" * * * In the interpretation of the Constitution * * * we are to ascertain

the meaning by getting at the intention of those making the instrument. What thought was in the mind of those making the Constitution—what was their intention, is the great leading rule of construction."

In *Edge v. Brice*, 253 Iowa 710, 718, 113 N.W.2d 755, 759 (1962), we said:

"It is proper in our determination to consider the intention of the framers of the provision as the language used, the object to be attained, or evil to be remedied, and the circumstances at the time of adoption indicate. (Authorities). * * *."

In *Halsey & Co. v. Belle Plaine*, 128 Iowa 467, 471, 104 N.W. 494, 495–496 (1905), we said:

" * * * In proceeding to give construction to a provision of the Constitution, it is of importance that we begin by making ascertainment of the particular object intended to be subserved. To this end we are required primarily to look to the words employed, giving to them meaning in their natural sense and as commonly understood. If necessary to a fuller understanding, we may place ourselves in touch with the makers of the instrument, and share in their view of the general subject by reading the constitutional debates; also the contemporary legislation, if any, having relation to the subject-matter. We may take note of the evil as manifestly sought to be remedied or guarded against, and of the conditions to be affected, then existing or reasonably to be apprehended in the future, and as disclosed by the authentic history of the state. (Authorities). * * *." See also 16 C.J.S. Constitutional Law § 19, pp. 81–87; 16 Am.Jur.2d, Constitutional Law, § 64, pp. 239–241.

■ The history, purpose and intended meaning of Art. I, § 3 of our constitution can be clearly traced and described. Like similar provisions included in the constitutions of all sister states Art. I, § 3 has a common origin and parallel history with the First Amendment to the United States Constitution. All such provisions were aimed at disestablishment of state churches or, in cases of later western states such as Iowa,

at preventing the establishment of state churches. The history of religious freedom in America was summarized in *Everson*, supra, 330 U.S. at 8–16; 67 S.Ct. at 507–511, 91 L.Ed.2d at 719–723; and in *Tudor v. Board of Education*, 14 N.J. 31, 100 A.2d 857, 45 A.L.R.2d 929 (1953).

Among authorities cited by Justice Black in *Everson* were Sweet, The Story of Religion in America (1939) and Cobb, Religious Liberty in America (1902). These and various other authorities document the fact that nine of the thirteen American colonies had established churches at the opening of the American Revolution. Agitation for separation of church and state began before the opening of the revolution and continued into the nineteenth century.

The existence of a state church brought with it the familiar evils carefully described in *Tudor*, supra. An evil existing both on a state or colony basis and on a local basis was a taxing or tithing process particularly galling to citizens who were not members of the state church.

An example from the Massachusetts Constitution, adopted in the midst of the revolution (1779), will serve as an example. Art. III of that constitution proclaimed "the right and duty of the legislature to authorize and require the several towns, parishes, precincts, and other bodies politic, or religious societies to make suitable provision at their own expense, for the instruction of the public worship of God." It was not until 1833, five years before creation of Iowa as a separate territory and a scant 13 years prior to our constitution of 1846, that Massachusetts provided for disestablishment. Disestablishment occurred in New Hampshire in 1817 and in Connecticut in 1818. *Sweet*, supra, at 275.

Under the Massachusetts law the church was a town institution; the choice of a minister being made at a town meeting. The system of taxing for church support in Massachusetts went back 200 years. The earliest legislative body of Massachusetts Bay considered as the first question at their initial meeting "how the ministers shall be mayntained?" Their answer was to provide

that houses should be built for the ministers and competent provision made for supplies and money "at publicke expense." In three months a court ordered the tax necessary for this purpose. Many acts of the legislature thereafter referred to such a provision. For example the general court in 1637 ordered the selectmen of Newberry to levy a tax for the minister's support and in 1638 enacted a general law that "all inhabitants are lyable to assessment for Church as for State," the tax to be collected by distraint if necessary. *Cobb*, supra, at 169.

Perhaps the most important event in the drive for disestablishment was the enactment on December 17, 1785 of the Statute of Virginia *For Religious Freedom*. The Virginia statute was the direct source of the First Amendment to the United States Constitution. *Everson*, supra, 330 U.S. at 14, 67 S.Ct. at 510, 91 L.Ed. at 722.

In view of the direct influence Thomas Jefferson and James Madison had on the enactment of the Virginia statute it is not surprising it became the model for the First Amendment to the United States Constitution. But it should be remembered the movement for disestablishment had been in progress for some time and four of the original 13 colonies had no state church. One of the four colonies with no state church was New Jersey. To prevent establishment of a state church the 1776 Constitution of New Jersey provided:

" 'That no person shall ever within this colony be deprived of the inestimable privilege of worshiping Almighty God in a manner agreeable to the dictates of his own conscience; nor under any pretense whatsoever; compelled to attend any place of worship, contrary to his own faith and judgment; *nor shall any person within this colony, ever be obliged to pay tithes, taxes or any other rates, for the purpose of building or repairing any church or churches, place or places of worship, or for the maintenance of any minister or ministry*, contrary to what he believes to be right, or has deliberately or voluntarily engaged himself to perform.' " (Emphasis supplied.) *Tudor*, supra, 14 N.J. at 41, 100 A.2d at 862, 45 A.L.R.2d at 735.

It should be remembered the First Amendment to the United States Constitution was long thought not to protect individual citizens from laws passed by the states. The United States Supreme Court held in a case decided before the adoption of the Fourteenth Amendment no provision in the federal constitution protected the religious liberties of citizens, that it was left to state constitutions and laws to provide such protection. *Permoliv v. Municipality No. 1 of the City of New Orleans*, 3 How. (U.S.) 389, 11 L.Ed. 739 (1845). See 16 Am.Jur.2d, Constitutional Law, § 336, p. 646.

Not until the filing of *Cantwell*, supra, in 1940, were the religious clauses of the First Amendment made applicable to the states.

Meanwhile the manner in which the various states addressed the question of religious liberty and structured the separation of church and state reached a certain consensus. See *Cobb*, supra, at page 520; Cooley's Constitutional Limitations (Eighth Ed.) pp. 966–975 (1927). Among the five general matters which Judge Cooley indicated were not lawful under any American constitution was: "(2) Compulsory support, by taxation or otherwise, of religious instruction. Not only is no one denomination to be favored at the expense of the rest, but all support of religious instruction must be entirely voluntary. It is not within the sphere of government to coerce it. * *." *Cooley's Constitutional Limitations*, supra, at 967. But Judge Cooley recognized such a principle of constitutional law was not offended under certain circumstances, including: " * * * [W]hen thanksgiving or fast days are appointed; *when chaplains are designated for the army and navy*; when legislative sessions are opened with prayer or the reading of Scriptures, * *." (Emphasis added.) *Cooley's Constitutional Limitations*, supra, at 975.

In view of the greater restraint placed on prisoners we see more reason for allowance for prison chaplains than for military chaplains.

To the extent our provision differs from the First Amendment to the United States Constitution we think our framers were merely addressing the evils incident to the state church. The framers addressed and provided a defense against the evils incident to a state church, forced taxation to support the same, and the payment of ministers from taxation. It is not surprising they should borrow from the language of the New Jersey constitution of 1776, hereinbefore quoted, in accomplishing their objectives.

In construing constitutional intent it is proper to look at contemporaneous legislative pronouncements. See *Green v. City of Cascade*, 231 N.W.2d 882, 890 (Iowa 1975). See also *Edge*, supra; *Carlton v. Grimes*, 237 Iowa 912, 23 N.W.2d 883 (1946); *Halsey & Co.*, supra.

Iowa's first constitution was adopted in 1846. Its second, the current constitution, was adopted in 1857. Art. I, § 3 of both constitutions were identical. In 1855, during the period between the enactment of our two identical religious liberty provisions, the General Assembly enacted a law which in relevant part provided:

"It shall be the duty of the Inspectors and Warden of the Penitentiary to appoint a chaplin [sic] to the same, whose duty it shall be to give them religious instructions, such as may be found compatible with their condition and circumstances; the chaplain shall receive the sum of one hundred dollars per annum for his services, to be paid by the Warden, out of the appropriation therefor." Laws of Iowa, chapter 96, pp. 157–158 (1855).

That provision with alterations has remained in our statutes and appears in the present § 246.3, The Code. It now provides:

"The warden, deputy warden, assistant deputy warden, chief clerk, *chaplain, additional chaplain*, physician, storekeeper, record clerk, and receiving officer of the penitentiary and men's reformatory shall receive such salaries as shall be determined by the state director."

It is obvious the 1855 legislature did not feel Art. I, § 3, of the 1846 Constitution proscribed having chaplains at the state penitentiary. It also seems likely the delegates to the 1857 Iowa Constitutional convention did not feel Art. I, § 3, of our present constitution would proscribe a statutory scheme then recently enacted.

We have considered Art. I § 3, in very few cases. *State v. Bartels*, 191 Iowa 1060, 181 N.W. 508 (1921); *Knowlton v. Baumhover*, 182 Iowa 691, 166 N.W. 202 (1918); *State v. Amana Society*, 132 Iowa 304, 109 N.W. 894 (1906); *Moore v. Monroe*, 64 Iowa 367, 20 N.W. 475 (1884); *Davis v. Boget*, 50 Iowa 11 (1878); *The Trustees of Griswold College v. State*, 46 Iowa 275 (1877). We believe none of these cases are controlling. *The Trustees of Griswold College*, supra, perhaps comes the closest to interpreting the meaning of "tithes, taxes or other rates." But the case stands only for the proposition the phrase did not prevent exemption of church property from taxation, a holding not inconsistent with this opinion.

The parties discuss and dispute the meaning of terms "minister" and "chaplain." See Black's Law Dictionary, Revised Fourth Ed., page 168 which defines chaplain and page 294 which defines minister. While we perceive a distinction we do not believe it to be conclusive.

Our determination is controlled by the same forces and concerns which caused the federal courts to strike a balance between the establishment and free exercise clauses of the First Amendment to the United States Constitution. We do not believe the prohibition contained in the last clause of Art. I, § 3 in any way disturbs the balance. The prohibition which provides "nor shall any person be compelled to attend any place of worship, pay tithes, taxes, or other rates for building or repairing places of worship, or the maintenance of any minister, or ministry", was inscribed in our constitution to prevent the establishment of a state church. The language was borrowed, as we have seen, from eastern states which had earlier struggled with the same problem. The provision of ministers

and places of worship within the prisons in this state is lawful, not in order to spread or encourage religion there, but rather in order to accord the prisoners their guaranteed right to exercise it.

The trial court enjoined not only the payment of chaplains' salaries but also the maintenance of places of worship within the penitentiary. This was in accordance with the prayer in plaintiffs' petition. On oral submission of this appeal plaintiffs contend more strongly against the payment of chaplains' salaries and suggest in argument the free exercise clause might be satisfied by tolerating the presence in the prison of clergymen sent there on a voluntary basis.

Any such argument manifestly presupposes the legislature acted unconstitutionally in *how* it balanced the free exercise and establishment clauses. Under our scheme of government it is for the legislature and not for contending parties to strike such a balance so long as it does so within the constitutional framework. We believe the legislature has stayed within such framework. We hold the trial court erred in enjoining the payment of public funds for the purposes specified.

III. Defendants claim the State is constitutionally required, not merely permitted, to provide chaplains and facilities hereunder challenged. Since the legislature has seen fit to provide the services we see no reason to speculate on what our holding should be if the legislature chose not to so provide. We do not reach defendants' claim.

The judgment of the trial court is accordingly reversed and the cause remanded for an order dissolving the injunction heretofore issued. Tax costs to the plaintiffs.

REVERSED AND REMANDED.

MOORE, C. J., and MASON, LeGRAND, REES, REYNOLDSON, and McCORMICK, JJ., concur.

UHLENHOPP and RAWLINGS, JJ., dissent.

UHLENHOPP, Justice (dissenting).

The question is *not* whether religion in prisons is desirable. Undoubtedly religion has brought solace and comfort to many prison inmates and has helped turn inmates around and head them toward useful and constructive lives. Rather, the question is whether religion shall be brought to prison inmates by the taxpayers or by churches and religious groups. More specifically, the question is whether the legislature can constitutionally appropriate tax funds to bring religion to prison inmates. This question involves the separation of church and state mandated by the United States and Iowa Constitutions.

I. The First Amendment to the United States Constitution states with respect to religion:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof  . . . .

The Iowa Constitution goes a step further in § 3 of Article I:

> The General Assembly shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; nor shall any person be compelled to attend any place of worship, pay tithes, taxes, or other rates for building or repairing places of worship, or the maintenance of any minister, or ministry.

Probably the most important factor which determines how we apply these constitutional limitations to specific situations is the *general approach* that we take to the clauses. I think we should not apply the clauses narrowly. Rather, we should apply them as we apply other constitutional clauses, giving them full effect according to their language. The United States Supreme Court enunciated the approach to be taken to constitutional limitations generally, in *Fairbank v. United States,* 181 U.S. 283, 288–289, 21 S.Ct. 648, 650–651, 45 L.Ed. 862, 864:

> We are not here confronted with a question of the extent of the powers of Congress, but one of the limitations imposed by the Constitution on its action, and it seems to us clear that the same

rule and spirit of construction must also be recognized. If powers granted are to be taken as broadly granted, and as carrying with them authority to pass those acts which may be reasonably necessary to carry them into full execution; in other words, if the Constitution in its grant of powers is to be so construed that Congress shall be able to carry into full effect the powers granted, it is equally imperative that where prohibition or limitation is placed upon the power of Congress that prohibition or limitation should be enforced in its spirit and to its entirety. It would be a strange rule of construction that language granting powers is to be liberally construed, and that language of restriction is to be narrowly and technically construed.

Giving the present constitutional language separating church and state its full meaning does not indicate hostility toward religion; it simply means giving full effect to constitutional language.

We are dealing here with one of our state institutions, the penitentiary. The record before us shows that in this institution the state provides one floor of a state building for exclusive permanent use as a Protestant chapel and another floor for exclusive permanent use as a Catholic chapel. Each of these chapels contains the usual altar, furniture, symbols, art, and artifacts of a church. The state constructed and maintains, heats, and lights the building of which the chapels are parts.

The state employs one part-time and two full-time chaplains for the penitentiary, who are under the regular merit system for state employees. The chaplains receive their salaries and benefits from tax funds and carry on the usual religious activities of clergymen—they conduct regular worship services, administer the sacraments, and provide religious counseling. To exemplify the nature of the functions of the chaplains, counsel asked an inmate to compare his chaplain with one of the regular prison counselors. The inmate answered:

I don't feel there is any comparison, you know. I think Father Hoenig is a man of the cloth, and I think basically his duty, you know, is to deal with us on a religious basis, you know, to deal with the soul rather than the physical needs, you know, and the inner parts of an individual, you know, the things you don't see, you know.

The same characterization appears from the evidence to be true of the other two chaplains, Rev. Ray, a Baptist, and Rev. Prochnow, a Lutheran.

The state employs these chaplains under its merit system specifications. The Iowa Merit Employment Department has the following under the heading of "Iowa Chaplain" in its "Class Specification Sheet" (Rev. May 14, 1971):

*Definition.* Under general supervision, performs professional pastoral work in providing counseling and worship services at a State institution; performs related work as required.

*Education, Experience and Special Requirements. Minimum.* Graduation from college and a seminary and ordination as a pastor in one of the recognized faiths or denominations and three years of pastoral experience.

Does the use of tax funds for these chapels and chaplains transgress the Federal Constitution? The portion of the First Amendment to the Federal Constitution relating to religion applies to the states through the Fourteenth Amendment. *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213. The trial court held that the state's financial support for the religious purposes related does not violate the Federal Constitution, citing *School Dist. of Abington Twp. v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844. That case, however, dealt with religious exercises by pupils in public schools, and eight members of the Court held the exercises to violate the First and Fourteenth Amendments.

The present case has a unique characteristic. It is not the usual case in which a party claims some state action *indirectly* fosters religion. Here we have outright *direct* use of tax money for places of wor-

ship and chaplains. I find this direct financial support very difficult to reconcile with language of the United States Supreme Court in *Everson v. Board of Education of the Twp. of Ewing*, 330 U.S. 1, 16, 67 S.Ct. 504, 511–512, 91 L.Ed. 711, 723: "No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion." See also *Committee for Public Education & Religious Liberty v. Nyquist*, 413 U.S. 756, 772, 93 S.Ct. 2955, 2965, 37 L.Ed.2d 948, 962: "What our cases require is careful examination of any law challenged on establishment grounds with a view to ascertaining whether it furthers any of the evils against which that Clause protects. Primary among those evils have been 'sponsorship, financial support, and active involvement of the sovereign in religious activities.' *Walz v. Tax Comm'n,* supra, at 668 [397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697]."

II. I believe a conclusion on the federal constitutional challenge is unnecessary, however, because of additional express language in the Iowa Constitution.

The trial court held that the appropriation of tax funds for the present religious purposes does transgress the Iowa Constitution. Section 3 of our Iowa Bill of Rights, in addition to the establishment and free exercise clauses, has this additional third part,

> nor shall any person be compelled to attend any place of worship, pay tithes, taxes, or other rates for building or repairing places of worship, or the maintenance of any minister, or ministry.

Our main cases on § 3 are *Trustees of Griswold College v. State*, 46 Iowa 275; *Davis v. Boget*, 50 Iowa 11; *Moore v. Monroe*, 64 Iowa 367, 20 N.W. 475; *State v. Amana Society*, 132 Iowa 304, 109 N.W. 894; *Knowlton v. Baumhover*, 182 Iowa 691, 166 N.W. 202; and *State v. Bartels*, 191 Iowa 1060, 181 N.W. 508, rev'd 262 U.S. 404, 43 S.Ct. 628, 67 L.Ed. 1047. In the *Davis* case this court held that the "occasional and temporary" use of a public school building

for Sabbath schools, religious meetings, debating clubs, and temperance meetings was not unconstitutional. 50 Iowa at 15. In the *Knowlton* case this court stated broadly, "In this state the Constitution (article I, § 3) forbids the establishment by law of any religion or interference with the free exercise thereof *and all taxation for ecclesiastical support.*" 182 Iowa at 706, 166 N.W. at 207 (italics added).

Like the trial court, I am unable to square the third part of § 3 with two practices here. One practice is that of permitting exclusive and permanent use for religious purposes of space in a building which the state built and maintains, heats, and lights, from tax funds. I think this violates the portion of the third part, "nor shall any person be compelled to . . . pay . . . taxes . . . for building or repairing places of worship . . . ." The other practice is that of paying salaries and benefits to the three chaplains from tax funds. I think this violates the portion of the third part, "nor shall any person be compelled to . . . pay . . . taxes . . . for . . . the maintenance of any minister, or ministry."

The court majority justifies use of tax funds for these practices by a process of construction of the third part of § 3: historically, the evil aimed at was taxation for the support of a state church; this is not support of a state church; ergo this is not within the prohibition.

The difficulty with this process of construction is the language of the third part of § 3. Sometimes constitutional clauses are abstract and general such as "due process of law," and historical antecedents are needed to fill in meaning. Due process does not have " 'a fixed content unrelated to time, place and circumstances.' It is 'compounded of history, reason, the past course of decisions . . . .' *Joint Anti-Facist Refugee Committee v. McGrath*, 341 U.S. 123, 162, 163, 71 S.Ct. 624, 643, 644, 95 L.Ed. 817 [848, 849] (concurring opinion)." *Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230, 1236. Other clauses in the

Bill of Rights contain broad sweeping guarantees which make historical background useful to understanding—such as freedom of speech and of press, and indeed "establishment of religion" and "free exercise thereof." But the language in the third part of § 3 is of the opposite kind, *concrete* and *specific*: no one may be taxed for building or repairing places of worship or for maintaining any minister or ministry.

A constitutional clause may also be uncertain or ambiguous, making the historical setting useful in ascertaining the meaning intended. An illustration is *Missouri P. Ry. v. Kansas*, 248 U.S. 276, 39 S.Ct. 93, 63 L.Ed. 239. There the question was whether approval by two-thirds Congressional vote, in the section of the Federal Constitution on Presidential veto, refers to two-thirds of the members present or two-thirds of all members. The Court considered historical background in resolving the problem.

Here however we have clear, definite, unambiguous language: no taxation for building or repairing places of worship or maintaining any minister or ministry. Hence the principle applies that construction is unnecessary and we are to be guided by the ordinary meaning of the words. The United States Supreme Court stated that principle of constitutional law in the early days of the Republic, and the courts have applied it to this day. The Court stated with reference to a constitutional debt limitation clause, in *Board of Lake County Comm'rs v. Rollins*, 130 U.S. 662, 670, 9 S.Ct. 651, 652, 32 L.Ed. 1060, 1063:

Why not assume that the framers of the constitution, and the people who voted it into existence, meant exactly what it says? At first glance, its reading produces no impression of doubt as to the meaning. It seems all sufficiently plain; and in such case there is a well-settled rule which we must observe. The object of construction, applied to a constitution, is to give effect to the intent of its framers, and of the people adopting it. This intent is to be found in the instrument itself; and, when the text of a constitutional provision is not ambiguous, the

courts, in giving construction thereto, are not at liberty to search for its meaning beyond the instrument.

Elsewhere the principle is stated thus:

It is a general principle that the intention to which force is to be given is that which is embodied and expressed in the constitutional provisions themselves, for words are the common signs that mankind make use of to declare their intentions to one another. When the words of a man express his meaning plainly, distinctly, and perfectly, there is no occasion to have recourse to any other means of interpretation. 16 Am.Jur.2d Constitutional Law § 70 at 248.

And in 16 C.J.S. Constitutional Law § 19 at 81–84:

If the language used is clear and unambiguous its meaning and intent are to be ascertained from the instrument itself by construing the language as it is written. Unless the context suggests otherwise, words are to be given their natural obvious, or ordinary meaning. To ascertain the meaning of a constitution, therefore, the first resort in all cases is to the natural significance of the words used, in the order and grammatical arrangement in which the framers placed them. If, thus regarded, the words used convey a definite meaning which involves no absurdity and no contradiction between parts of the same writing, then the meaning apparent on the face of the instrument is the one which alone courts are at liberty to say was intended to be conveyed. There is no occasion for construction where the language is plain and definite.

The proscription on tax support in the third part of § 3 extends to "places of worship." I do not see any question about the two chapels we have here: they are places of worship. A chapel is defined as "A place of worship; a lesser or inferior church, sometimes a part of or subordinate to another church." Black's Law Dictionary (4th Ed.).

Nor can I see any question about the three chaplains we have here: they are ministers. By definition the Merit Depart-

ment specifications require that chaplains in state institutions "perform professional pastoral work in providing counseling and worship services," and the specifications further mandate "Graduation from college and a seminary and ordination as a pastor in one of the recognized faiths or denominations and three years of pastoral experience." The actual activities of these chaplains are those of a minister—they conduct worship services, they provide religious counseling, and they administer the sacraments.

Moreover, the framers of the third part of § 3 spoke broadly in connection with ministers. The framers did not limit the proscription to certain kinds or classes of ministers; taxes cannot be used to maintain "any" minister or ministry. We should not strain to find obscurity or ambiguity when the constitutional language is clear. 16 Am.Jur.2d Constitutional Law § 75 at 257 (courts "are not at liberty to disregard the plain meaning of the words of a constitution in order to search for some other conjectured intent").

Without expressing an opinion on the first two parts of § 3, I would hold that legislative appropriation of tax funds to provide and maintain prison chapels and chaplains violates the third part of § 3 of the Iowa Bill of Rights.

Finally, would the result I reach mean that the Iowa Constitution cuts off prison inmates from all religion except such as they can provide for themselves? Not at all. As to space, this court pointed to a constitutionally permissible way in *Davis v. Boget*, 50 Iowa 11. Incidental religious use of a public building is permissible. Spaces such as mess halls, meeting rooms, auditoriums, gymnasiums, and other facilities in our state institutions may be used for religious purposes, provided the use is entirely subordinate to the regular use so that the taxpayers are not put to additional expense. Apparently this is the present practice of the Church of the New Song in the penitentiary. As to personnel, I believe that our churches and religious groups, which have founded and operate edifices, colleges, hos-

pitals, orphanages, and foreign missions, are able through such agencies as their boards of home missions to support clergy for the inmates of prisons. These are the kinds of sources from which financial support for religion in prisons should come, rather than taxation.

I would affirm the judgment entered by the District Judge that appropriation of tax funds for the present religious purposes is unconstitutional.

RAWLINGS, J., joins in division II of this dissent.