STATE of Iowa, Appellee,

v.

Carl Eric OLSEN, Appellant.

No. 64030.

Supreme Court of Iowa.

Jan. 20, 1982.

Raymond Rosenberg, of Rosenberg & Margulies, Des Moines, for appellant.

Thomas J. Miller, Atty. Gen., and Thomas N. Martin, Asst. Atty. Gen., for appellee.

Considered by LeGRAND, P. J., and HARRIS, McCORMICK, ALLBEE, and LARSON, JJ.

LARSON, Justice.

The defendant, Carl Eric Olsen, appeals from his jury conviction for possession of a controlled substance, marijuana, with intent to deliver, § 204.401(1), Code Supp. 1977. On appeal he presents four issues: The trial court's (1) allowing a prosecution witness to testify beyond the minutes; (2) overruling his motion to suppress evidence obtained through searches; (3) allowing an expert witness to express an opinion on the defendant's guilt or innocence by testifying his actions fell "within the method of operation of a person selling drugs for profit"; and (4) refusing to instruct the jury as requested concerning his use of marijuana as a part of his religion.

The State concedes error on the first issue and agrees the case must be retried. Accordingly, we address that issue only briefly. Because the problems surrounding the search, the opinion evidence, and the requested instruction on the religious use of marijuana will doubtless recur on retrial, we consider those issues as well.

I. *Minutes of testimony.*

Iowa Rule of Criminal Procedure 5(3) provides:

> The prosecuting attorney shall, at the time of filing such information, endorse or cause to be endorsed thereon the names of the witnesses whose evidence the prosecuting attorney expects to introduce and use on the trial of the same, and shall also file with such information the minutes of evidence of such witness which shall consist of a notice in writing stating the name, place of residence and occupation of each witness upon whose expected testimony the information is based, and a full and fair statement of the witness' expected testimony.

In *State v. Walker*, 281 N.W.2d 612, 614 (Iowa 1979), this court held that the minutes of testimony "must be sufficient—fully and fairly—to alert defendant generally to the source and nature of the evidence against him."

■ Olsen contends that in the present case the trial court erred in permitting Ron Foreman, a Newton police officer, to testify over objection as an expert witness on the packaging, distributing, and selling of marijuana because the State's minutes of testimony stated only that

> [w]itness, Ron Foreman, Newton, Iowa, will testify that he is a member of the Newton Police Department and that he is evidence custodian for said NPD; that he removed from the evidence locker at the Newton Police Department all of the items marked with the defendant's name and mailed them to the BCI Laboratory in Des Moines, Iowa, for analysis. Witness will testify further in the matter.

Olsen asserts, and the State agrees, that Foreman's testimony was thus limited, under *Walker*, to his duties as evidence custodian for the Newton Police Department.

This case is virtually indistinguishable from *State v. Olsen*, 293 N.W.2d 216, 220 (Iowa), *cert. denied*, 449 U.S. 993, 101 S.Ct. 530, 66 L.Ed.2d 290 (1980). There, the State's minutes stated that a witness would testify about "the processing [of] evidence obtained from the defendant's vehicle"; at trial, however, the State "asked him questions concerning methods of packaging and distributing marijuana." The trial court overruled the defendant's objections to the scope of the officer's testimony. On appeal, the State acknowledged the trial court erred in these evidentiary rulings. The case was then remanded for a new trial. We reach the same result here.

## II. *The searches and seizures.*

Olsen unsuccessfully moved to suppress money and marijuana seized from his person, and from the glove compartment and trunk of his car. At approximately 2:00 a. m. on January 19, 1978, Newton police officers Daniel McPherren and Joseph Lyman were patrolling on Interstate Highway 80 near Newton. They observed a blue Cadillac Eldorado traveling east at a slow rate of speed, repeatedly crossing the centerline and the shoulder of the highway. The officers turned on the squad car's signal lights and the Cadillac eventually pulled over to the shoulder of the interstate. The officers parked their car behind it. Olsen left his vehicle to meet the approaching officers, who noticed he was unsteady on his feet. McPherren, proceeding past Olsen to the Cadillac, shined his flashlight inside it but observed nothing suspicious. He returned to the shoulder area where Lyman was questioning Olsen.

Olsen stated that he had just left Des Moines and explained that his unsteady driving was the result of his being "kind of tired." At Lyman's request, Olsen handed over his driver's license for the officer's inspection, but had some difficulty in removing it from his wallet. The officer then requested to see the Cadillac's registration papers. Olsen returned to his vehicle, entered it from the driver's side, crawled across the front seat, and opened the glove compartment. Lyman, who had followed Olsen, and McPherren, who was watching from the passenger side of the car, shined their flashlights into the car's interior. Lyman, upon Olsen's opening of the door, could smell "a very strong odor of burned or burning marijuana," and when Olsen opened the glove compartment to obtain the registration, both officers observed "two or three bundles of money laying in it." McPherren also noticed a clear, plastic "sandwich bag" rolled up in the corner of the compartment. Lyman then ordered Olsen to unlock the passenger side door and he complied. McPherren confiscated the money and the plastic bag, which was found to contain fuses.

Lyman asked Olsen if he could search his person. In response to Olsen's inquiry as to the purpose of the search, Lyman informed him that "he fit the general description" of a suspect in an armed robbery which had occurred in Des Moines that night, and that the search was "for weapons and anything else." Olsen denied any participation in the robbery and told Lyman "to go ahead" and search him. A pat-down search was made, which revealed Olsen was carrying a bundle of several hundred dollars in his shirt pocket, as well as three marijuana cigarettes in

his right coat pocket. When questioned about the large amount of money in his possession, Olsen responded that "a friend" had given it to him to use in purchasing a car, but declined to identify him.

Olsen was then placed under arrest for "possession of marijuana, for one," and was told "[w]e will let you know the rest of [the charges] when we get to the station." Believing Olsen was the suspect in the Des Moines armed robbery, Lyman requested the Des Moines dispatcher to repeat the description of the suspect, which had been broadcast earlier in the night. He received information "which again fit Mr. Olsen's description." Meanwhile, McPherren began a search of the Cadillac's interior, which did not reveal any contraband or weapons. McPherren then asked Olsen for the keys to the vehicle for the purpose of driving it to the police station and Olsen handed them to the officer. McPherren, however, used the keys to open the Cadillac's trunk.[1] Inside was a brown paper bag which the officer found, upon "flash[ing] my light down inside" it, to contain "a whole pile of money, and underneath that, plastic bags." McPherren "moved the money aside" and "could see it was marijuana" in the bags.

Olsen was taken to the police station and strip searched. More money and some notebooks were discovered in his coat.

It is unclear from Olsen's motion to suppress which of the searches he was challenging, or whether he was challenging all of them. He merely alleged there was "no probable cause . . . to search or seize evidence from the defendant or the vehicle." The officers searched Olsen's person and automobile, including the trunk. On appeal, Olsen challenges neither the searches of his person nor the search of the brown paper bag in the trunk. The major thrust of his argument is that there was no probable cause to search the trunk itself. He argues that, even assuming probable cause existed for a search of the car's interior, it would not extend to a search of its trunk, in which he had a greater expectation of privacy.

■ The law of automobile searches seems to be plethoric, if not clear. A warrantless search is presumed to be unreasonable, thus unconstitutional. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585 (1967). To withstand constitutional scrutiny, therefore, the State must show the case comes within a recognized exception to the warrant requirement. *Id.; Coolidge v. New Hampshire*, 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564, 576 (1971).

■ Generally, there have been two exceptions to the warrant requirement in the search of automobiles. The first is known as the "incident-to-arrest exception," which had its genesis in *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), *overruled, Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960), and was later refined in *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). It is premised upon the need "to remove any weapons that [the subject] might seek to use in order to resist arrest or effect his escape," and to prevent concealment or destruction of evidence. *Id.* at 763, 89 S.Ct. at 2040, 23 L.Ed.2d at 694. Under this exception the person of the arrestee and the "area from within which he might have obtained either a weapon or something that could have been used as evidence against him" may be searched. *Id.* at 768, 89 S.Ct. at 2043, 23 L.Ed.2d at 697. In the recent case of *New York v. Belton*, —— U.S. ——, ——, 101 S.Ct. 2860, 2864–65, 69 L.Ed.2d 768, 776–76 (1981), the Supreme Court attempted to establish a "bright line" rule in applying the incident-to-arrest exception to automobile searches. Under the *Belton* rule the passenger compartment and all containers within it may be searched incident to arrest. *Id.* In *Belton* the

---

**1.** The State does not contend the search of the trunk was consented to by Olsen's act of giving the car keys to the officers. McPherren asked him for the keys for the purpose of driving the car, and told Olsen that he had to turn them over. Under such circumstances it cannot be said that Olsen's release of the keys was voluntary and free from duress. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 248, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854, 875 (1973).

search of a zipper-closed pocket of a jacket lying on a car seat was upheld, even though the arrestee had been removed from the car and was not in a position, physically, to reach a weapon or remove evidence.

The second general exception to the warrant requirement in automobile searches is known, appropriately, as the "automobile exception," first applied in *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). The increased possibilities of escape and removal of evidence in the case of automobiles, coupled with a presumed reduction in the expectation of privacy in their use, were considered to be sufficient justifications for relaxed warrant requirements, provided probable cause and exigent circumstances were shown. Later, in *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979) the Court narrowed the scope of automobile searches, holding that a valid search of an automobile did not include the search of a suitcase located within it. In *Robbins v. California*, —— U.S. ——, ——, 101 S.Ct. 2841, 2847, 69 L.Ed.2d 744, 752 (1981), filed the same day as *New York v. Belton*, the Court, in a plurality opinion, extended the protection of the fourth amendment to all "closed, opaque" containers and packages within the automobile. It eliminated the distinction between "worthy" containers such as suitcases, which arguably involve elevated expectations of privacy, and "unworthy" containers such as boxes and bags. It was too difficult, the Court held, to perceive any workable, objective criteria for making these distinctions. As Justice Stewart observed, "What one person may put into a suitcase, another may put into a paper bag." *Id.* at ——, 101 S.Ct. at 2846, 69 L.Ed.2d at 751.

██ With these rules in mind, we consider the searches in this case. First, the two searches of his person, as to which Olsen has raised no specific objection, were proper as incidents to his arrest for possession of marijuana. *See United States v. Robinson*, 414 U.S. 218, 235, 94 S.Ct. 467, 477, 38 L.Ed.2d 427, 440–41 (1973); *State v. Sanders*, 312 N.W.2d 534, 539 (Iowa 1981); *State v. Johnson*, 232 N.W.2d 477, 479 (Iowa

1975). Similarly, the searches of the car's passenger compartment, including the glove compartment, were proper under *New York v. Belton.* (Actually nothing was seized from the passenger compartment pursuant to a search; the money in the glove compartment was seized without a search because it was in plain view, *Harris v. United States*, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968), and the search of the remainder of the passenger area revealed no evidence.)

The search of the locked trunk, however, presents a closer question. The search-incident-to-arrest exception is clearly inapplicable; the trunk was neither the "passenger compartment," *New York v. Belton*, —— U.S. at ——, 101 S.Ct. at 2864–65, 69 L.Ed.2d at 775–76, nor an area from which a weapon or evidence could be readily seized by the arrestee, *Chimel v. California*, 395 U.S. at 763, 89 S.Ct. at 2040, 23 L.Ed.2d at 694. Olsen argues that the automobile exception of *Carroll v. United States* and *Robbins v. California* is also inapplicable. Possession of three marijuana cigarettes, he argues, did not constitute probable cause for a search of the trunk because the relatively small amount of marijuana involved indicated it was for personal use, not a part of marijuana trafficking. He concludes the expanded search into the trunk was unreasonable in scope, thus unconstitutional. The State, however, does not attempt to base the trunk search on probable cause arising out of the marijuana possession but rather on the basis the officers had probable cause to believe Olsen was involved in the Des Moines armed robbery.

At 10:58 p. m. on January 18, between three and four hours before their arrest of Olsen, the officers had received this radio communication, taken from the Des Moines police radio dispatch log, concerning a robbery in Des Moines:

[Time:] 10–35 [*viz.*, a major crime alert] 1414 sw
2258　　army post git and go 10 min ago wm 20's 6 ft heavy build grn parka bushy hair or wearing stocking cap poss veh bro and yellow olds or chevy approx year 68 unk direction of travel subj is 10–32 [*viz.*, armed] auth dsm p d

Olsen is a white male, in his twenties, and approximately six feet tall. This part of the radio description fit him, although the robbery subject was of a "heavy build" and Olsen weighs approximately 160 pounds. The radio description said the suspect had "bushy hair or wearing stocking cap." Olsen was described as having "long straggly hair," not bushy, but he was wearing a stocking cap. He also had a beard, while the radio dispatch was silent on whether or not the robbery suspect had one. The suspect was said to be wearing a green parka, while Olsen was wearing a brown leather jacket, and the suspect's car was described as a yellow Oldsmobile or Chevrolet, while the car Olsen was operating was a blue Cadillac.

Olsen argues that the discrepancies in the personal and automobile descriptions were too great and that no reasonable person could conclude he was the subject of the radio communication. The State contends that there were sufficient facts pointing to Olsen as the robbery suspect to establish probable cause: Olsen had been traveling away from Des Moines and stated he had just left there. He was evasive in his responses to the officer's questions concerning the source of the several thousand dollars in cash, bundled in various denominations, found in his glove compartment and on his person. And, although Olsen did not match item for item with the broadcast description of the suspect, sufficient similar characteristics existed between the two to justify the officers' beliefs he was, in fact, the suspect.

■ Although it is a close question on probable cause, we believe it was established here. It would be reasonable for the officers to assume the suspect had changed cars and coats, and that the radio description merely omitted mention of the beard. Here was a white male, in his mid-twenties, about six feet tall, wearing a stocking cap, all as mentioned in the broadcast, admittedly traveling from Des Moines in possession of several thousand dollars in cash, bundled in various denominations and who, when asked where he had obtained it, said it came from a friend, whom he "didn't know."

Under all of the circumstances, we believe probable cause for a search of the car, including its trunk, was established.

### III. *Expert opinion testimony.*

At trial, an officer in the Newton Police Department testified as an expert witness:

Q. How are large quantities of marijuana broken down for distribution and sale?

A. They are broken down ... into smaller bags, and then the price is put on the bag determined by the weight.

\* \* \* \* \* \*

Q. [D]o you have an opinion whether or not profit can be made from this type of operation?

A. Yes. I feel that profit can be made.

\* \* \* \* \* \*

Q. In this case the defendant was found in possession of a notebook, and approximately one pound of marijuana in six separate bags in Jasper County, at least one of these bags of marijuana having been apparently mixed with a tobacco substance.

Do you have an opinion as to whether or not this action fits within the method of operation of a person selling marijuana for profit?

\* \* \* \* \* \*

A. Yes, I do.

Q. What is that opinion?

A. I feel that this could fit into the method of operation of a person who was selling drugs for profit.

Olsen contends that in its examination the State was actually asking an opinion of the expert which went directly to his guilt or innocence, not a proper subject of expert testimony.

■ We have held that, while a witness may not testify whether marijuana is held for personal use, *State v. Oppedal*, 232 N.W.2d 517, 524 (Iowa 1975), he may testify on the pattern or *modus operandi* of a certain offense and compare the facts of the

case to it, *State v. Burrell*, 255 N.W.2d 119, 123 (Iowa 1977); *State v. Johnson*, 224 N.W.2d 617, 622 (Iowa 1974). The distinction is that, on the one hand, the witness is asked for an opinion based upon certain evidence as it relates to a well-defined *modus operandi* and on the other, an opinion on the guilt or innocence of the defendant. The former is proper; the latter is not. *State v. Johnson*, 224 N.W.2d at 622–23. We have said this line of distinction, while fine, is nevertheless essential. *Id.* at 622; *State v. Horton*, 231 N.W.2d 36, 38 (Iowa 1975). Thus, we held in *State v. Burrell*, 255 N.W.2d at 123, that an opinion on "whether or not profit can be made from this type of operation" was proper:

> The question asked does not address the particulars of the case, but rather seeks to define a *modus operandi.* This court has approved the question which goes one step further, that is, did defendant's actions fit within the *modus operandi*, so long as the witness is not asked whether the defendant is innocent or guilty.

■ The opinions tendered here, that a profit may have been realized under the facts, and that the acts were consistent with an operation for profit, were properly admitted as comparisons to the typical *modus operandi* and not as opinions on guilt or innocence.

■ Olsen also contends that packaging and distributing marijuana was not an appropriate subject matter for opinion testimony because it could not aid the jury in the discharge of its duties. *See State v. Heck*, 301 N.W.2d 741, 743 (Iowa 1981); *State v. Gartin*, 271 N.W.2d 902, 912 (Iowa 1979). We do not agree; this type of testimony is helpful to a jury and is outside the realm of common knowledge and experience. As such it is admissible. *See State v. Johnson*, 224 N.W.2d at 622; *State v. Hines*, 223 N.W.2d 190, 192 (Iowa 1974).

IV. *Requested instructions on religious use of marijuana.*

The third issue we consider likely to recur on retrial concerns the trial court's refusal to submit to the jury the issue of the constitutional protection accorded to Olsen's use of marijuana as part of the practice of his religion. This guarantee applies to state action through the incorporation of its principles into the fourteenth amendment's due process clause. *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213, 1217–18 (1940); *Rudd v. Ray*, 248 N.W.2d 125, 127 (Iowa 1976). The issue Olsen raises is whether the State's prohibition against the possession of marijuana unconstitutionally infringes upon his use of the drug for religious purposes:

> The free exercise clause prohibits the making of a law which in any way interferes with the free exercise of religion. The prohibition extends to unorthodox as well as orthodox religious beliefs and practices. It extends to religious organizations and individuals. It denies the government any power to proscribe, regulate, favor directly or indirectly any particular religious beliefs or doctrines (though not necessarily the acts which citizens may feel called upon to perform in compliance with their religious views).

*Rudd v. Ray*, 248 N.W.2d at 128.

According to Olsen's testimony, he was a "priest" in the Ethiopian Zioncoptic Church, and had been a member for three years. The church's only sacrament is marijuana, or "ganja," and is combined with tobacco and smoked "continually all day, through church services, through everything that we do." The drug is used both on a communal and an individual basis. This usage is consistent with Olsen's, and apparently the church's, interpretation of the Bible: "[O]n the first page . . . God gave the commandment that every green herb bearing seed was to be used for meat and the healing of nations, and it didn't make any distinction." Although Olsen admits he had marijuana in his possession at the time of his arrest, he contends it was only for use in the church. He thus argues it was error for the trial court to refuse his requested instructions on the religious use of marijuana.

In order to sustain a claim under the free exercise clause there must be a substantial interference by the state with the exercise of a "sincerely" held central "religious belief." If there is a sufficiently compelling state interest at stake which outweighs the effect of the state's interference, the claim will not be sustained. *See Sherbert v. Verner*, 374 U.S. 398, 406, 83 S.Ct. 1790, 1795, 10 L.Ed.2d 965, 972 (1963); *Teterud v. Burns*, 522 F.2d 357, 360–62 (8th Cir. 1976).

A broad definition of religion for purposes of the free exercise clause has been advocated by our court, *e.g., Rudd v. Ray*, 248 N.W.2d at 128 (free exercise clause "extends to unorthodox as well as orthodox religious beliefs and practices") and by other authorities:

> Clearly, the notion of religion in the Free Exercise clause must be expanded beyond limits of theism to account for the multiplying forms of recognizably legitimate religious exercise.
>
> \*   \*   \*   \*   \*   \*
>
> [A]ll that is "arguably religious" should be considered in a free exercise analysis.
>
> \*   \*   \*   \*   \*   \*
>
> [W]hen free exercise issues are raised, religious claims are to be examined not in terms of the majority's concept of religion but in terms of the social function of the group, or in terms of the role the beliefs assume in the individual's life.

L. Tribe, *American Constitutional Law* § 14.6, at 827, 828, 831 (1978) (footnote deleted); *accord, Fowler v. Rhode Island*, 345 U.S. 67, 69–70, 73 S.Ct. 526, 527, 97 L.Ed. 828, 830–31 (1953) ("it is no business of the courts to say what is a religious practice or activity for one group is not religion under the protection of the First Amendment"); *see Wisconsin v. Yoder*, 406 U.S. 205, 215–17, 92 S.Ct. 1526, 1533–34, 32 L.Ed.2d 15, 25–26 (1972); *Remmers v. Brewer*, 494 F.2d 1277, 1278 (8th Cir.), *cert. denied*, 419 U.S. 1012, 95 S.Ct. 332, 42 L.Ed.2d 286 (1974).

We assume, without deciding, that the religion practiced by Olsen is one which is protected by the free exercise clause and that Olsen's belief in the marijuana sacrament is "sincere and central" to the religion. *Tribe, supra* § 14.11, at 859–61. Once these requisites are met, and a person has demonstrated that state action has interfered with the exercise of the religious belief,[2] the State bears the burden of proving that interest is outweighed by a compelling state interest. *See Wisconsin v. Yoder*, 406 U.S. at 236, 92 S.Ct. at 1543, 32 L.Ed.2d at 37.

The state board of pharmacy examiners, the agency which administers the regulatory provisions of chapter 204, by its recommendations to the legislature has determined that marijuana has a "potential for abuse." *See* § 204.401(1), (2), The Code.

In January, 1971, the Iowa Drug Abuse Study Committee submitted its final report to the legislature. The Committee was established to study "the subject of drug abuse and related matters in order that proper legislative steps may be taken to limit the improper use of drugs and other substances for depressant, stimulant, or hallucinogenic purposes." *Drug Abuse Study Committee Final Report*, 64th G.A. 1 (1971). In recommending that the legislature adopt in essence the Uniform Controlled Substances Act, the Committee said in part: "Use of marijuana may in some ways be considered to present one of the most difficult aspects of the current drug abuse problem. It is perhaps the drug most readily accessible to and widely used by young people."

Courts considering the issue appear to have uniformly refused to sustain a free exercise claim with regard to marijuana use. *E.g., United States v. Kuch*, 288 F.Supp. 439 (D.C.Cir.1968); *Town v. Florida*, 377 So.2d 648 (Fla.1979), *cert. denied*, 449 U.S. 803, 101 S.Ct. 48, 66 L.Ed.2d 7 (1980) (compelling state interest in prohibiting distribution of marijuana by general religious beliefs." *State v. Moorhead*, 308 N.W.2d 60, 64 (Iowa 1981).

---

**2.** "A party challenging a . . . law as violating the free exercise clause . . . has the burden to show how the law infringes upon the party's

public and in protecting public from church members driving under the influence); *Lewellyn v. State*, 592 P.2d 538 (Okla.Crim. App.1979) (compelling state interest in prohibiting distribution of marijuana to general public); *People v. Mullins*, 50 Cal.App.3d 61, 123 Cal.Rptr. 201 (1975) (marijuana usage not essential to practice of the Universal Life Church of Christ Light); *State v. Soto*, 21 Or.App. 794, 537 P.2d 142 (1975) (compelling state interest in health and safety of general public), *cert. denied*, 424 U.S. 955, 96 S.Ct. 1431, 47 L.Ed.2d 361 (1976); *People v. Crawford*, 69 Misc.2d 500, 328 N.Y.S.2d 747 (1972); *State v. Bullard*, 267 N.C. 599, 148 S.E.2d 565 (1966), *cert. denied*, 386 U.S. 917, 87 S.Ct. 876, 17 L.Ed.2d 789 (1967); *State v. Big Sheep*, 75 Mont. 219, 243 P. 1067 (1926).

█ A compelling state interest sufficient to override Olsen's free exercise clause argument is demonstrated in this case. The trial court did not err in refusing to submit the requested instructions.

We reverse under the issue discussed in Division I and remand.

REVERSED AND REMANDED.