Patricia J. **VOSWINKEL, and the Society of Separationists, Inc. (a/k/a American Atheists), Plaintiffs,**

v.

**CITY OF CHARLOTTE and J. C. Goodman, as Chief of the Charlotte Police Department, Defendants.**

**No. C–C–80–012.**

United States District Court,
W. D. North Carolina,
Charlotte Division.

July 18, 1980.
Judgment Aug. 19, 1980.

Jonathan Wallas and James C. Fuller, Jr., Chambers, Stein, Ferguson & Becton, P. A., Charlotte, N. C., for plaintiffs.

Henry W. Underhill, Jr., City Atty., Richard D. Boner, Asst. City Atty., City of Charlotte, Charlotte, N. C., for defendants.

## MEMORANDUM OF DECISION

McMILLAN, District Judge.

### I.

### INTRODUCTION

This is a suit for declaratory and injunctive relief challenging the constitutionality of the police chaplaincy recently created by the City of Charlotte. Patricia J. Voswinkel, the individual plaintiff and president of the local chapter of the corporate co-plaintiff, the Society of Separationists, Inc., is a resident taxpayer of the City of Charlotte and an avowed atheist. The individual defendant, J. C. Goodman, is chief of police for defendant City of Charlotte.

The position in question is the result of an agreement between the City of Charlotte and Providence Baptist Church approved by the Charlotte City Council on November 19, 1979. The agreement pro-

vides that the Church will furnish the City with the services of a minister to serve as a "full-time" police chaplain. After opposing the agreement unsuccessfully before the City Council, plaintiffs brought suit challenging the arrangement as violative of the First Amendment prohibition against any law "respecting an establishment of religion." Defendants' motion to dismiss was denied after plaintiffs successfully amended the complaint to show standing to challenge the municipal act in question. The suit is now before the court on opposing motions for summary judgment.

■ Defendants contend the arrangement should be sustained as one with both a secular purpose and a predominantly secular effect. Plaintiffs insist the agreement gives a preferred position to the Providence Baptist Church, and to Baptists and Protestants in general, over other religious groups and results in "excessive entanglement" of the City with religion. Both sides submitted lengthy briefs, and the motions were heard on oral argument on April 10, 1980. It appears from the evidence of record that, while some facts are disputed, the disputed facts are not material to a decision in the case. After considering relevant decisions of the Supreme Court and lower courts, I hold that, on the undisputed evidence, the agreement providing for the police chaplain violates the Establishment Clause, as applied to the states through the Fourteenth Amendment. Accordingly, plaintiffs are entitled to summary judgment. A discussion of the evidence and the law follows.

## II.

### THE EVIDENCE

The evidence before the court consists of the admitted allegations of the complaint; the depositions of Police Chief Goodman and Police Chaplain Dennis L. Whitaker; a stipulation of facts; a copy of the agreement; and an affidavit by Dr. Daniel Biber, a practicing clinical psychologist. Except where otherwise indicated, the evidence is uncontroverted.

The text of the agreement approved on November 19, 1979, is reproduced here in its entirety. Those provisions which assertedly render the entire agreement void under the Establishment Clause are underlined for emphasis.

NORTH CAROLINA
MECKLENBURG COUNTY

### AGREEMENT

This Agreement made and entered into this the 19th day of November, 1979 by and between the CITY OF CHARLOTTE, hereinafter referred to as the City, and PROVIDENCE BAPTIST CHURCH, hereinafter referred to as the Church.

### WITNESSETH:

That for and in consideration of the mutual covenants and promises contained herein, the parties hereto do agree as follows:

Beginning January, 1980, the Church will provide to the City's Police Department the services of a minister who will act as a full-time police chaplain. The minister will be clinically trained in counseling and crisis intervention, and selection will be only on approval by the City's Chief of Police. The minister, acting as a police chaplain, will be a staff assistant to the Chief of Police and will perform the following duties:

1. Serve as advisor to the Chief in any matter pertaining to the moral, spiritual and mental welfare of police personnel.

2. Counsel individual police officers and/or their family members in times of personal crisis, sickness, job-related stress, injury or death.

3. Assist officers and family members as necessary in obtaining appropriate outside professional services such as marriage counselors, psychologists, psychiatrists, and financial planning counselors.

4. Assist police officers and/or medical or rescue personnel in emergencies, disasters or other crisis situations;

5. Visit sick or injured police officers at home or in the hospital;

6. Provide non-religious instruction at the Police Academy or at recruit orientation on areas of stress, crisis-handling and services of the chaplain;

7. Notification of the family of a police officer or employee of the death of or serious injury to the officer or employee;

8. Appearances at civic clubs, churches or other groups as a public relations representative of the Police Department.

The Police Chaplain shall be on call at all times through the police dispatcher and keep the dispatcher aware at all times of his location. He will make regular monthly reports of his activities to the Police Chief and to the advisory committee described herein. He will follow proper police procedures outlines [sic] in the Operations Manual of the Police Department.

The Police Chaplain shall not engage in religious instruction nor conduct any service of religious worship while wearing the uniform of his office or while acting in his capacity as Police Chaplain. The Chaplain may provide religious guidance to any police officer or other person he is counseling when he is specifically requested to do so by the officer or other person being counseled. The Police Chaplain shall not release any information to the news media or the public without the permission of the Chief of Police. The Police Chaplain shall not divulge to anyone information given to him in confidence by a police officer or any other person.

The Police Chief shall seek the assistance of the Charlotte Clergy Association in designating a Chaplain's advisory committee to include the former police chaplain, members of the clergy reflective of a cross-section of the membership in the Police Department, and also representation from members of the Police Department as determined by the Police Chief. Such committee will advise the Chief and the Chaplain on the role and activities of the chaplain and on the spiritual and moral welfare needs of police personnel.

The Police Chaplain shall be paid by the Church the sum of $20,000.00 annually as consideration for his services—including $10,000 from the Church and $10,-000 from the City, paid pursuant to this contract. The City will furnish the chaplain equipment, an office and uniform, and make necessary arrangements for transportation.

This agreement may be terminated by either party upon the giving of thirty (30) days written notice.

The chaplain hired pursuant to the agreement is Dennis L. Whitaker, an ordained Baptist minister. He assumed his duties as police chaplain in January of 1980 (Stipulation of Fact). His background and experience combine religious training, clinical and classroom education in counseling, and extensive exposure to the area of law enforcement prior to his entering Southeastern Baptist Seminary in 1976.

Beginning in 1969 or 1970, Whitaker worked for roughly two years in public relations for a nonprofit agency involved in traffic safety. In 1971, he began five years as a criminal justice planner for the Centralina Council of Governments. During this time he had many contacts with police officers and gained extensive familiarity with police operations. One task he performed during these years was to help secure funding for courses "on stress management for police officers and how police officers could deal with family crisis situations." (Whitaker deposition at 4–7.)

Whitaker left his position as criminal justice planner in 1976 to begin study at the seminary. While there, he took "a great many courses related to counseling, family problems, crisis situation counseling." He spent his last year as a "chaplain intern" at Wake County Medical Center in Raleigh. A substantial part of his study at the seminary was, of course, devoted to religious matters (Whitaker deposition, at 7–9).

Whitaker testified at considerable length on his understanding of his duties under the agreement, particularly with respect to the provision that, while the chaplain is "not to engage in religious instruction nor conduct

any service of religious worship," he "may provide religious guidance to any police officer or other person he is counseling when he is specifically requested to do so by the officer or other person being counseled." Whitaker testified to his belief, and that of all Baptists, that Jesus Christ represents the exclusive means to personal salvation and that Baptists have a duty to spread the Gospel. But Whitaker further testified that "I don't see that it would be incumbent upon me as a chaplain, ministering to people of all beliefs or nonbeliefs, to force my particular beliefs on anyone. . . . I have an obligation under the Christian tenets and under the church to respect the rights of the individual as to what he chooses to believe." (Whitaker deposition at 11.) On the other hand, he said, if an "individual indicated a problem in religious matters, if he indicated he wanted religious counseling, then it would be my obligation to talk with him about that. . . . [I]f he comes up and says something that leads me to believe that he is, in whatever terms—that he wants some kind of religious help, then I will proceed to help him, not along Baptist tenets, but along the tenets of religion, meaning in this case anyone who believes in a god of any description, . . . and my function is a referral. I will refer him." (Whitaker deposition at 13.) Later Whitaker testified that a request for religious guidance could result from his own suggesting of religious and nonreligious alternatives to a person who sought his assistance:

Q. Now, suppose that same person comes to you and describes the situation and again they have no internal way of knowing what the solution is, but in describing it to you, it becomes apparent in your judgment that that person needs some religious help. Are you saying that you would just sit quietly, and, if that person didn't bring it up, you wouldn't mention what you thought was necessary to solving their problem?

A. I would do what would be consistent as any counselor secular or otherwise, and suggest alternatives to that individual. I would not try to force or twist his arm in any direction.

Q. But certainly agreeing that you would not try to force your views or either force your counseling on him, it is also true, isn't it, that it might be in the course of counseling that you would actually initiate his consideration of religious alternatives?

A. Among other alternatives, yes, sir.

Q. And if he responded to those, you might very well be in the position to provide the religious counseling right on the spot, isn't that correct?

A. If he specifically asks me to do so, yes, sir.

(Whitaker deposition at 13–14.)

Whitaker identified his occupation as "chaplain, Police Department." He stated that he had no other employment duties; that his employer "for purposes only of salary, payment and benefits is the Providence Baptist Church." (Whitaker deposition at 1–2.) He confirmed that the Police Department and the Church each provide one-half of his $20,000 salary. The Church receives the City's contribution and in turn issues Whitaker's paycheck after deducting taxes and benefits. The check is drawn on the Church account and signed by the Church business manager (Whitaker deposition at 18–19). Whitaker, however, is not on the staff of the Church. His only involvement in Church activities is attending worship services (Whitaker deposition at 2).

A considerable portion of both Goodman's and Whitaker's testimony dealt with the reasons for requiring that a minister fill what the City insists is a secular office. Goodman said this decision was dictated by several factors. Foremost were considerations of economy and availability:

Q Now, assuming that you found someone who was qualified in the areas of you said clinical psychologist and counselor, what would then be the advantage of having a chaplain instead of someone from a secular walk who had the same counseling abilities?

A Economic considerations, for one thing, to hire a psychologist, they come pretty high. They work on an hourly fee,

an hourly basis, and they are not always available at three o'clock in the morning or whatever time you might need them, whereas a fulltime chaplain doesn't cost as much, and he does make himself available 24 hours a day, 7 days a week, as much as possible.

Q Are those the only two reasons that you would then prefer a chaplain, the economic savings and the availability around the clock?

A Those are the two reasons, and also the fact that he is available for other things other than just the emergency type counseling.

Q What other things?

A Counseling in domestic matters, for one.

Q Is there any reason that a counselor or social worker couldn't counsel in domestic things?

A I don't know of any reason.

Q I am still trying to determine then the ways in which having a chaplain would be preferable to having some other counselor. You have indicated economic advantages and availability around the clock. What other positive factors do you see in having a chaplain?

A He is available should the men call on him for any reason whatsoever, any type of counseling. He does not volunteer spiritual counseling, but should they need it, he can give it.

Q And if they should need spiritual counseling in the context of their job, then he would give that too?

A If they would ask for it.

Q And you say that a secular counselor, if we can use that phrase, would not be available to give the spiritual counseling?

A I already mentioned the fact that he is available, and he will respond any time day or night, whereas I don't think you could get anyone else to do that.

Q What attempts did you make to find a counselor, social worker, psychologist, who would be available on basically the same terms and conditions as the chaplain?

A We have had need in the past for such counseling. We have had experience with psychiatrists, and we know they have regular office hours. We know the prices they charge. We know the availability. We know how unavailable they are when you need them. We know appointments have to be set up and met, and this does not suit our needs.

Q Did you make any specific attempts to find not only a psychologist but a social worker who would be available or could be available around the clock at roughly the same amount of money?

A No, sir, but we have had experience. We have used them on multiple occasions, and we know what they charge.

\* \* \* \* \* \*

(Goodman deposition at 2–4.)

The accuracy of these assumptions is challenged by Dr. Daniel Biber in his affidavit. Biber said there are qualified counselors and clinical psychologists available in this area who would work for less than $20,000 a year and would be available on a 24-hour basis. No evidentiary support was offered for Goodman's and Whitaker's belief that *only* a chaplain would be available twenty-four hours a day. Nor was there evidence from which it could reasonably be inferred that *only* a minister would take a counseling job at a salary of $20,000 a year. Goodman himself conceded: "I don't know about all psychiatrists and all psychologists. I don't know about them, and all social workers." (Goodman deposition at 5.)

Another justification—in which Whitaker concurred—is a chaplain's superior ability to offer "spiritual counseling," which Chief Goodman defined as:

A That is a man that is bleeding and needs help and can't be provided by man.

Q You are talking about touching then of the individual's relationship with God by whatever name called, right?

A Yes.

Q Whatever his own religious or spiritual views, might be, is that right?

A Something along that line.

\* \* \* \* \* \*

## III.

## DISCUSSION

■ The test for determining whether a governmental act violates the Establishment Clause is well-settled:

"[O]ur decisions . . . dictate that to pass muster under the Establishment Clause the law in question, first, must reflect a clearly secular legislative purpose, . . . second, must have a primary effect that neither advances nor inhibits religion, . . . and, third, must avoid excessive government entanglement with religion. . . ."

*Committee for Public Education v. Nyquist,* 413 U.S. 756, 772–73, 93 S.Ct. 2955, 2965, 37 L.Ed.2d 948 (1973). The court will proceed to apply this three-part test to the facts of this case.

A. *Purpose.*—First, the government act in question must not have a religious purpose. Application of the secular purpose test is hampered by the dearth of precedent. Only rarely have state acts been found to have the impermissible *purpose* of advancing religion, *e. g., Epperson v. Arkansas,* 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) (anti-evolution law). In any event, the evidence bearing on purpose here is inconclusive. On the one hand it could be argued that a contract like the one before the court could only be the product of an intent to advance religion. On the other hand, some evidence would support the inference that the City has merely used questionable means to achieve an essentially secular purpose. The question of purpose is therefore not appropriate for resolution on summary judgment.

■ B. *Effect.*—Second, the government action must not have "a primary effect that advances or inhibits religion." One could interpret this opaque language to mean only that religious effects must not predominate over secular effects. This is the interpretation advanced by the defendants. If defendants were correct, they would very well be entitled to prevail on this issue, for the arguably secular functions of the police chaplain could reasonably be said to outweigh the religious, in some rough, quantitative sense. Defendants are in error, however. It is clear from the decisions applying this test that the word "primary" is not a synonym for "greater" or "predominant." Rather, it is used in the sense of "direct" or "nonsecondary," as distinguished from "remote" or "incidental."

"Appellees, focusing on the term 'principal or primary effect' which this Court has utilized in expressing the second prong of the three-part test, . . . have argued that the Court must decide in these cases whether the 'primary' effect of New York's tuition grant program is to subsidize religion or to promote these legitimate secular objectives. . . . We do not think that such metaphysical judgments are either possible or necessary. *Our cases simply do not support the notion that a law found to have a 'primary' effect to promote some legitimate end under the State's police power is immune from further examination to ascertain whether it also has the direct and immediate effect of advancing religion.*"

*Committee for Public Education v. Nyquist, supra,* 413 U.S. at 783–84 n. 39, 93 S.Ct. at 2971 n. 39 (emphasis added).

This understanding of the "primary effect" test is consistent with the results in cases in which it has been applied. The Supreme Court has, on more than one occasion, struck down those portions of an otherwise proper governmental program that threatened to aid religion. And, where the offending portions could not be severed, the Court has not hesitated to void the entire statutory program. In *Tilton v. Richardson,* 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971), the Court struck down part of the federal Higher Education Facilities Act because of "the mere possibility that a federally financed structure might be used for religious purposes 20 years hence." *Nyquist, supra,* 413 U.S. 784 n. 39, 93 S.Ct. 2971 n. 39. In *Levitt v. Committee for Public Education and Religious Liberty,* 413 U.S. 472, 93 S.Ct. 2814, 37 L.Ed.2d 736 (1973), the Court was presented with a New

York statute that provided state aid to *all* nonpublic schools to defray the costs of administering and scoring both state-mandated, standardized tests and non-mandated, teacher-prepared tests. The Court found the statute constitutionally unacceptable, simply because it could have had the effect, in church-related schools, of financing teacher-prepared tests that were calculated, in part, to further religious ends. The Court then struck down the statute *in toto*, even though a properly audited state program to reimburse church schools for costs only of *state-mandated* tests would be constitutionally permissible, *see Committee for Public Education and Religious Liberty v. Regan*, —— U.S. ——, 100 S.Ct. 840, 63 L.Ed.2d 94 (1980). In *Nyquist*, the Court struck down a state statute authorizing state grants to nonpublic schools for maintenance and repair, simply because there was no guarantee that some of the state funds would not be used for buildings devoted, at least in part, to religious pursuits. *Id.* 413 U.S. at 777, 93 S.Ct. at 2967. The Court so ruled even though it found the statute to have the legitimate secular purpose of advancing safety and education. *Id.* at 773, 93 S.Ct. at 2965. As the Court has observed:

> "Such secular objectives, no matter how desirable and irrespective of whether judges might possess sufficiently sensitive calipers to ascertain whether the secular effects outweigh the sectarian benefits, cannot serve today any more than they could 200 years ago to justify such a direct and substantial advancement of religion."

*Id.* at 785 n. 39, 93 S.Ct. at 2971 n. 39.

The agreement here necessarily has several obvious, direct, and constitutionally impermissible effects:

 1. It provides for a publicly funded position that must, under the terms of the agreement, be filled by a "minister." To the extent that one's status as a minister depends on some degree of adherence to the creed of, and is subject to control by, the denomination one serves, the agreement necessarily imposes a religious test for eligibility to a publicly funded office. *Compare McDaniel v. Paty*, 435 U.S. 618, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1978) (denial of state office to ministers, while an unconstitutional burden on religious *activity*, does not necessarily *penalize* religious *belief*). Religious tests for public employment are unconstitutional *per se*. *McDaniel v. Paty, supra* at 626, 631–32, 98 S.Ct. at 1327, 1330 (Brennan, J., concurring), 642–43, 98 S.Ct. at 1336 (Stewart, J., concurring); *Torcaso v. Watkins*, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961) (notary public required to declare belief in God). *See also Abood v. Detroit Board of Education*, 431 U.S. 209, 234–35, 97 S.Ct. 1782, 1799, 52 L.Ed.2d 261 (1977).

There is no evidence that the parties ever contemplated that Providence Baptist Church would furnish anyone other than a *Baptist* minister, though the agreement does not expressly limit eligibility to that extent. According to common understanding, the promise of a "minister" at least requires some variety of Protestant clergyman. It could perhaps be extended to cover priests of the Roman Catholic or Greek Orthodox faiths. *See* Webster's Third New International Dictionary 1439 (1968). It could not be reasonably read to permit a Jewish rabbi or a Muslim imam. It necessarily precludes employment of a qualified counselor who is an atheist or agnostic, or a member of a religious sect which, like some divisions of Quakerism, lacks a formal clergy. It also bars those persons, who, while devout, have not qualified as ordained ministers of their particular sect.

This religious test would be unconstitutional in any public job. It is especially objectionable when applied to this particular job. Despite the City's assurances that it acted with a secular purpose and that the position is largely secular in content, it cannot be gainsaid that the job has unavoidable religious connotations. The jobholder is called a "chaplain." He must be a "minister." He is to advise in "spiritual" and "moral" affairs. He is to seek advice on the "spiritual and moral welfare needs of

police personnel" from a Chaplain's Advisory Committee whose only outside members are local clergymen. It is true, as defendants argue, that provision for "spiritual" and "moral" needs is not necessarily inconsistent with a purely secular counseling function. Concern for such matters is not the exclusive province of the religious; it may be that even atheists have spiritual interests. Still, when all is said, moral and spiritual matters are the most vital objects of religious concern. Indeed, there is little if anything that is religious that could not be characterized as one or the other. Given these unavoidable religious associations, the use of a religious test brings this particular state activity even closer to the heart of what the Establishment Clause was intended to prevent.

2. This is the only chaplain position the City has funded and the only such agreement it has entered (Stipulation of Fact). The Church is therefore in the unique position of providing the nominee to a position with unavoidable religious associations. While all the evidence indicates that the Church receives no *financial* benefit from the funds expended by the City, the Church will garner whatever prestige may result from its position as the supplier of the City's only "full-time police chaplain." It is also necessarily the case that Baptists have the "inside track" in providing religious guidance to those police officers who are disposed to request it. This superior opportunity afforded Baptists to disseminate their views to members of the police department cannot be considered an insubstantial benefit to a religious sect.

And whatever the impact, the contract necessarily creates an appearance of religious favoritism. This appearance, by itself, offends the Establishment Clause. *Compare, e. g., Allen v. Morton*, 495 F.2d 65, 75 (D.C.Cir. 1973) (Tamm, J., concurring) (Constitution forbids the appearance, as well as the actuality, of government interference in religious matters).

The record is virtually silent on the reasons why the City chose this particular church to render this service. At the hearing, counsel for both sides did indicate that the choice was a consequence of the fact that the minister who served the department as an unpaid volunteer chaplain for many years is associated with Providence Baptist. It would make no difference, however, if the choice resulted from an official determination that Providence Baptist Church was better qualified than any other local religious agency to furnish the police department with ministers or was willing or able to underwrite a higher percentage of the cost than any other denomination. (Indeed such a showing might breed as many First Amendment problems as it would solve.) The particular benefit that the agreement provides the Church is not one that the City may properly bestow on a particular church for any reason. This is not a case where the government has, through a law of general application, conferred benefits on religious and nonreligious groups alike. It is not a case where the government has dealt with a particular church in some matter devoid of religious significance—as where the state leases a building from a religious body for some secular purpose. *E. g., Thomas v. Schmidt*, 397 F.Supp. 203 (D.R.I.1975). Rather the City of Charlotte has contracted with one particular church to provide a service that is inextricably linked with religious concerns.

3. Another necessary consequence of the contract is that the City is financing the provision of expressly religious benefits to some, but not all, of the police department's employees. The agreement states that the chaplain is not to engage in unsolicited religious instruction. The agreement does, however, allow the chaplain to give "religious guidance" to those employees who request it. Obviously, the police officers who will be most inclined to ask the chaplain for religious guidance are those who would consider a Baptist clergyman a useful source of such guidance. Those who are so disposed may thus obtain religious counseling from a quasi-public functionary with an office at police headquarters. Those who are not must go elsewhere. This favoring of the religious needs of some of the

department's employees offends the Establishment Clause. *Compare Pitts v. Knowles,* 339 F.Supp. 1183 (W.D.Wis.1972) *aff'd,* 478 F.2d 1405 (7th Cir. 1973) (prison officials had abundant supply of Christian bibles, mostly donated by private charities, for free distribution to inmates, while only access to Koran was two copies on reserve in prison library).

It has long been recognized that the Establishment Clause requires neutrality between competing religions and between religion and nonreligion. *E. g., Walz v. Tax Commission,* 397 U.S. 664, 669, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970). As the Supreme Court declared in *Everson v. Board of Education,* 330 U.S. 1, 15, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1947):

> "The 'establishment of religion' clause . . . means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another."

The present arrangement is simply inconsistent with this fundamental rule of neutrality.

The court is aware of cases which hold or suggest that military, prison, or legislative chaplaincies are constitutionally acceptable. Those cases are distinguishable from the one here. Given the extraordinary restraint to which both soldiers and prisoners are subjected, the provision of chaplains can be considered as a reasonable government measure to fulfill the coequal constitutional obligation not to interfere with the free exercise of religion. *See Abington School District v. Schempp,* 374 U.S. 203, 296–98, 83 S.Ct. 1560, 1610–1611, 10 L.Ed.2d 844 (1963) (Brennan, J., concurring). There is no suggestion here that police officers are like soldiers or prisoners in this respect or that they are substantially less able than other public or private employees to pursue their spiritual needs.

■ With respect to legislative chaplaincies, the Establishment Clause certainly does not prohibit legislators from opening their sessions with voluntary prayer. *E. g., Bogen v. Doty,* 598 F.2d 1110 (8th Cir.

1979). The expenditure of public money for that purpose presents a closer question. *Compare Everson, supra,* at 16, 67 S.Ct. at 511, *with Colo v. Treasurer and Receiver General,* —— Mass. ——, 392 N.E.2d 1195 (1979). There are constitutionally significant differences, however, between a legislative chaplaincy and the police chaplaincy here. The former, through centuries of custom, may have become—like the motto "In God We Trust" on our coins—purely ceremonial in its impact and "interwoven the motto so deeply into the fabric of our civil polity that its present use may well not present that type of involvement which the First Amendment prohibits." *Abington School District v. Schempp, supra,* at 303, 83 S.Ct. at 1614. There is also the historic reluctance of the courts to interfere in the internal affairs of legislative bodies. Neither consideration applies here.

C. *"Excessive Entanglement"*—The third prong of the test asks whether the challenged government program results in "excessive entanglement" of government with religion. The question of how much entanglement is "excessive" is admittedly an elusive one. As the Supreme Court has observed:

> "Our prior holdings do not call for total separation between church and state; total separation is not possible in an absolute sense. Some relationship between government and religious organizations is inevitable. . . . Judicial caveats against entanglement must recognize that the line of separation, far from being a 'wall' is a blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship."

*Lemon v. Kurtzman,* 403 U.S. 602, 614–15, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745 (1971). "The objective is to prevent, as far as possible, the intrusion of either into the precincts of the other." *Id.* at 614, 91 S.Ct. at 2112.

The police chaplaincy creates or threatens "excessive entanglement" in at least three respects. The first arises from the ambiguity of the position in question. It is not clear to whom the chaplain must answer, in the last analysis, in the performance of his

duties. Is he employed by the City, by the Church, or jointly by both? On the one hand, his occupational title is "police chaplain." The City furnishes him an office, a uniform, a car and half of his salary. He is a "staff assistant to the Chief of Police." His selection is contingent upon approval by the Chief of Police. On the other hand, his employer "for purposes only of salary, payment and benefits is the Providence Baptist Church." He receives his paycheck from the Church and the Church is the ultimate source of the other half of his salary. The Church nominates him for the Chief's consideration. The Church does not provide the minister; rather it provides "the *services* of a minister who will *act* as a full-time police chaplain." (Emphasis added.) Any view one might take of this relationship would, on reflection, offend the principle of separation of Church and State. The chaplain is either a church employee who must answer in his employment to the police chief; or he is a police employee in some respect answerable to the Church; or he is in some way responsible to both in the performance of what purports to be a public function.

The second source of entanglement arises from the City's presumably sincere attempt to secularize the police chaplaincy sufficiently to satisfy the First Amendment. On the one hand, the chaplain is free to give "religious guidance" when requested and is obligated under the contract to advise the Police Chief "in any matter pertaining to the moral, spiritual and mental welfare of police personnel." On the other hand, he is not to "engage in religious instruction nor conduct any service of religious worship." Without the latter prohibition, the contract could reasonably be seen as a direct establishment of the Baptist creed within the Charlotte Police Department. With the prohibition, however, the contract creates precisely the potential for entanglement in religious matters that the Supreme Court has repeatedly indicated is forbidden by the Establishment Clause. Either the contractual prohibition is intended seriously or it is not. If not, then the contract, again, could be seen as tanta-

mount to an establishment of religion in the Charlotte Police Department. If it is seriously intended, who will see that it is enforced? If it is to be left to the good intentions of the church and the minister, then the arrangement lacks the safeguards needed to insure that public funds are not in fact being used to further religion. Mere words of good intent in the document do not provide that assurance. *See Lemon v. Kurtzman*, 403 U.S. 602, 619, 91 S.Ct. 2105, 2114, 29 L.Ed.2d 745 (1971); *Levitt v. Committee for Public Education*, 413 U.S. 472, 480, 93 S.Ct. 2814, 2819, 37 L.Ed.2d 736 (1973). On the other hand, if the Police Chief is to see to it that the prohibition on religious activity is honored, then he must make the Solomonic distinctions between the religious instruction that the contract forbids and the moral and spiritual advice that the chaplain was hired to provide. If questions arise about the content of the *confidential* counseling sessions, the Police Chief must determine what constitutes a specific "request" for religious guidance. If he finds no specific request, he must decide if the resulting advice was religiously moral rather than secularly moral in content. To describe the enterprise is to recognize its impossibility. To attempt it is to engage in precisely the sort of official judgments about religious matters that the Establishment Clause, in part, was intended to avoid.

The impermissibility of such state scrutiny is underscored by the decision of the Supreme Court in *Lemon v. Kurtzman, supra.* That case dealt with state attempts to insure that public subsidies to teachers in church-related schools did not contribute to the advancement of religion. Despite the factual differences, what the Court said there has considerable relevance here:

"We need not and do not assume that teachers in parochial schools will be guilty of bad faith or any conscious design to evade the limitations imposed by the statute and the First Amendment. We simply recognize that a dedicated religious person, teaching in a school affiliated with his or her faith and operated to

inculcate its tenets, will inevitably experience great difficulty in remaining religiously neutral. Doctrines and faith are not inculcated or advanced by neutrals. With the best of intentions such a teacher would find it hard to make a total separation between secular teaching and religious doctrine. What would appear to some to be essential to good citizenship might well for others border on or constitute instruction in religion. Further difficulties are inherent in the combination of religious discipline and the possibility of disagreement between teacher and religious authorities over the meaning of the statutory restrictions.

"We do not assume, however, that parochial school teachers will be unsuccessful in their attempts to segregate their religious beliefs from their secular educational responsibilities. But the potential for impermissible fostering of religion is present. The Rhode Island Legislature has not, and could not, provide state aid on the basis of a mere assumption that secular teachers under religious discipline can avoid conflicts. The State must be certain, given the Religion Clauses, that subsidized teachers do not inculcate religion—indeed the State here has undertaken to do so. To ensure that no trespass occurs, the State has therefore carefully conditioned its aid with pervasive restrictions. An eligible recipient must teach only those courses that are offered in the public schools and use only those texts and materials that are found in the public schools. In addition the teacher must not engage in teaching any course in religion.

"A comprehensive, discriminating, and continuing state surveillance will inevitably be required to ensure that these restrictions are obeyed and the First Amendment otherwise respected. Unlike a book, a teacher cannot be inspected once so as to determine the extent and intent of his or her personal beliefs and the subjective acceptance of the limitations imposed by the First Amendment. These prophylactic contacts will involve excessive and enduring entanglement between state and church."

*Id.* 403 U.S. at 618–19, 91 S.Ct. at 2114.

In short, "the very restrictions and surveillance necessary to ensure that teachers play a strictly nonideological role give rise to entanglements between church and state." *Id.* at 620–21, 91 S.Ct. at 2115.

"A broader base of entanglement, of yet a different character," arises from the divisive political potential of the police chaplaincy. *Id.* at 622, 91 S.Ct. at 2115; *see* *Everson, supra,* 330 U.S. at 53, 67 S.Ct. at 534 (Rutledge, J., dissenting). Having entered into this novel relationship with a particular church, the City could hardly ignore proposals from any other local church for a similar arrangement. In that event, what criteria for decision would the City use? Will it contract for a multiplicity of full-time chaplains? Or will it decide that one church or the other is better qualified to provide the City with "the services of a minister who will act as a full-time police chaplain"? If so, on what basis will it make that decision? It is not necessary for plaintiff to show that there are other churches presently interested in furnishing a chaplain. It is enough, for Establishment Clause purposes, that such competition among churches for a special relationship with government is invited by the contract in question.

## CONCLUSION

The preceding discussion summarizes the court's reasons for holding the present arrangement unconstitutional. Here, since the matter is one of public interest, the court undertakes to identify those aspects of the agreement which it does not find objectionable and which were not relied on in the court's determination of unconstitutionality. First, the City may, of course, spend money to provide its police officers with the purely secular services described in the agreement. Second, there is nothing unconstitutional in hiring a clergyman to perform those services, so long as the clergyman is selected as the result of a religiously neutral process rather than, as

here, pursuant to a contract with a specific church that restricts eligibility to ministers. Indeed, to reject a job applicant *because* he is an ordained minister would violate the First Amendment prohibition against government interference with "the free exercise of religion," *see McDaniel v. Paty*, 435 U.S. 618, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1978), as well as statutory prohibitions against a religious discrimination in employment. *E. g.*, 42 U.S.C. § 2000e–2. *Neutrality* in religious matters, not *hostility* toward religion, is what the Constitution requires. *Zorach v. Clauson*, 343 U.S. 306, 313–14, 72 S.Ct. 679, 683–84, 96 L.Ed. 954 (1952). Third, the court does not believe that a public employee, hired as a *counselor* through some neutral selection process, is constitutionally required to refrain from discussing "spiritual," or "moral" matters in the course of his counseling duties. Fourth, there is nothing unconstitutional *per se* in a church's donating money or property to a governmental entity or in the passage of money from a government to a church for some purpose that does not threaten to assist religion or to entangle government excessively in religious affairs. Fifth, the court does not presume that the incumbent chaplain is unqualified to hold a counseling job or that anyone has acted in bad faith.

Here it is a combination of elements that renders the whole arrangement unconstitutional under the First Amendment. The City contends it wanted to provide a secular counseling service to its employees. But instead of soliciting applications from qualified counselors—without respect to religious belief or clerical status—the City chose to sign a contract with a particular church to provide it a "minister" to serve as a full-time, publicly funded police "chaplain." Having entered into an arrangement favoring religion over nonreligion and one religion over others, the City must have felt obliged to blunt the effect of its action by writing into the contract an essentially unenforceable disclaimer that the ordained minister who serves as the full-time chaplain, is not to offer unsolicited "religious" guidance while he privately counsels fellow human beings about moral and emotional

problems in times of great stress. Had the City chosen a religiously neutral method of achieving the secular end it now asserts, it would have had no need to concern itself with the possibility that counselor and counselee might, in the privacy of the counseling relationship, talk about religious needs and religious solutions. This is so because the creation of a counseling position to which any counselor could apply and be considered on religiously neutral grounds is not a government action that could reasonably be said to threaten "an establishment of religion." The City chose otherwise, and the choice it made is contrary to the First Amendment. There is no way in this case to sever the constitutional from the unconstitutional elements of the agreement. It therefore must fail *in toto*.

### JUDGMENT

Pursuant to the memorandum of decision and the order of July 18, 1980, granting summary judgment for the plaintiff,

IT IS ORDERED, ADJUDGED AND DECREED:

1. The agreement between the City of Charlotte and Providence Baptist Church as approved by the Charlotte City Council on November 19, 1979, and as quoted in full in this court's July 18, 1980, memorandum of decision at pages 3 and 4 (hereinafter the "agreement") violates the First and Fourteenth Amendments to the Constitution of the United States of America and is therefore null and void.

2. Defendants are enjoined from any further implementation of said agreement. Defendants are further ordered to cease the performance of any obligations set forth in the agreement including the payment for any future services pursuant to the agreement.

3. Plaintiffs are hereby awarded their costs including reasonable counsel fees and expenses, 42 U.S.C. § 1988. Counsel for the parties are directed to attempt to agree on the appropriate amount of counsel fees, costs and expenses. If the parties are unable to reach an agreement with respect to

these matters within twenty (20) days of the date of this order, plaintiffs are directed to file an appropriate motion and affidavit and the defendants are directed to file any response they deem appropriate within ten (10) days of receipt of plaintiffs' submissions. The court will then decide the appropriate amount of fees, costs and expenses.

The parties to this case, in letter form, have argued the question of entitlement of plaintiffs to attorneys' fees. The Clerk is directed to file those letters and the court treats them as briefs on the subject. The case of *Bills, et al. v. Hodges,* 628 F.2d 844 (4th Cir. 1980) appears to me to be determinative of all the questions raised and the letter-brief of the plaintiffs filed on August 6, 1980, is a thoroughly adequate response to the defendants' objections.

American taxpayers routinely and usually without protest pay the fees and expenses of lawyers who defend public servants who violate the constitutional rights of individuals. In 42 U.S.C. § 1988 Congress has authorized courts to require the taxpayers to pay also the fees and expenses of lawyers who successfully assert those constitutional rights of individuals. I have no reservations about awarding fees in this case.