**Larry Henry CARTER, Courtney Demaris Carter, Dr. Maurice La Belle, Plaintiffs,**

v.

**BROADLAWNS MEDICAL CENTER, et al., Defendants.**

**Civ. No. 84–800–E.**

United States District Court, S.D. Iowa, C.D.

July 9, 1987.

Scott Hartsook, Des Moines, Iowa, for plaintiffs.

James L. Sayre, Becky S. Knutson, Des Moines, Iowa, for defendants.

## MEMORANDUM OPINION AND ORDER

DONALD E. O'BRIEN, Chief Judge.

This case presents a challenge to the employment of a full-time chaplain at a tax-supported county hospital, Broadlawns Medical Center (BMC). This Court had previously denied the plaintiffs' request for preliminary injunction preventing the em-

ployment of such a chaplain.[1] Having carefully considered all the evidence, the Court finds that the employment of a chaplain at a tax-funded county hospital whose salary is paid for by tax revenues would violate the Establishment Clause of the First Amendment to the United States Constitution if that clause were viewed in isolation. However, the Court upholds BMC's present practice of employment a female unordained minister whose primary purpose is to provide clinical pastoral care and grief therapy for patients and their families. The Court finds that this is permissible under the Free Exercise Clause of the First Amendment to the United States Constitution. The Court also places some restrictions on the chaplain's activities to ensure that the chaplain's job assignment conforms to the rationale under which the Court sustains such a position. The Court also denies plaintiffs' claims for damages.

## FINDINGS OF FACT

Defendant BMC is a public county hospital located in Des Moines, Iowa. Established pursuant to Iowa Code Chapter 347, BMC is funded in the following ways: by property taxes levied on real estate located in Polk County, Iowa; by moneys received from the State of Iowa and the federal government; and by payments from patients. BMC provides care free of charge or at a reduced rate to indigent citizens of Polk County. Most of the patients do not have access to a telephone. Approximately 50% of BMC's patients do not have insurance, do not receive other governmental benefits, and are considered indigent.

BMC is controlled by a Board of Trustees elected by Polk County voters pursuant to Iowa Code § 347.9. The Trustees have all of the powers delegated to them by the State of Iowa under Iowa Code Chapter 347, including the power to hire an administrator and other employees for BMC.

(Iowa Code § 347.13.4.) The BMC Board of Trustees consists of seven members: Douglas Hart, John Ahern, William Dyar, Carole Romine, Margaret Stout, Jeanne Miller, and Milton Brown. Plaintiffs have included each Board member as a defendant in this suit.

In December 1983, Trustee Milton Brown received a letter from the Des Moines Area Religious Council urging the Board to create a pastoral care department and to employ a full-time chaplain. BMC had never previously employed a chaplain, and instead had relied on volunteer chaplains, a system that had proved to be inadequate. The Trustees discussed this proposal at numerous meetings in early 1984. Plaintiff Larry Carter appeared at these meetings along with other Polk County citizens. Plaintiff Carter represented himself, spoke as a member of the BMC Primary Care Advisory Board, and acted on behalf of American Atheists in opposing the chaplain proposal. Later, during a session of this trial, Carter informed the Court that he had a breakup with the American Atheists and was thereafter speaking only for himself.

At a Board meeting on January 10, 1984, Defendants Lloyd Kaufman, Reverend Peter Pintus, and Reverend Raymond Runkel urged the Board to hire a chaplain. These individuals were persuaded that it was difficult for BMC to get volunteer chaplains to visit patients on a regular basis.[2] The Court is persuaded by the testimony and the exhibits (Exhibit F at p. 7) that the volunteer chaplain effort has, particularly in recent years, received a "very poor" response.[3]

On June 12, 1984, the Board of Trustees approved the funding of a "chaplain" position at BMC. However, instead of hiring a "chaplain" in the generally accepted meaning of that term, the Board hired Maggie

---

1. The Court incorporates by reference its earlier order denying plaintiffs' request for a preliminary injunction.

2. Reverend Runkel testified that it had been very frustrating trying to get enough volunteers and that many times they only had a volunteer one or two days a week.

3. The Court recognizes that the Polk County Jail has had no problems getting ministers to come to that facility. The Court is not persuaded that that situation is analogous to the issues at BMC.

Alzeno Rogers, a female, who is *not* an ordained minister. Maggie Rogers graduated from the University of Dubuque Theological Seminary in 1984. She is "endorsed" by the United Church of Christ. However, as stated previously, she is, by her own choice, not an ordained minister. (Tr. 5).[4]

Initially, Rogers was hired under the following job description:

Provides religious ministry, pastoral care and counseling to patients, patients' families and staff of Broadlawns Medical Center. Recruits and coordinates the activities of volunteer chaplains.

(Exhibit E). Chaplain Rogers assisted in drafting a new job description after she began her employment (Tr. 13). It states in pertinent part:

To provide consistent pastoral care throughout the Medical Center, adding spiritual support and counseling to the ongoing healing effort.[5]

(Exhibit 53, p. 1). Chaplain Rogers believes, and the Court finds, that her activities at BMC comply with the detailed job description of Exhibit 53 and with the job description pursuant to which she was hired, Exhibit E.

Chaplain Rogers and the few volunteer chaplains who now assist her have had Clinical Pastoral Education (CPE). (Tr. 93). They all volunteer chaplains adhere to the principles of CPE. CPE is specialized training that prepares a minister to be effective in a hospital or other institutional setting.

Regarding education in CPE principles, Chaplain Rogers testified as follows:

Mr. Hartsook: What's taught in a basic clinical course?

Chaplain Rogers: ... You do a lot of work on your interpersonal style with other people, whether or not you can be self-disclosing or whether you hide behind your religion so to speak. You study how to be with patients, how to listen, how to communicate effectively, how to respect where they are and not force your own philosophy or faith onto them.

You study, for instance, how to administer a cardiac patient versus oncology patients and the various kinds of crises of physical well-being and mental well-being that happen to people. You may do some specialized study in an area like oncology or chemical dependency, but it's a broad spectrum program where you study theological issues, you study psychological issues, philosophical issues, in a setting with your peers so that you get a lot of feedback on what you're doing.

You also do verbatim accounts of conversations with patients, and you are helped by your peers and by your supervisor to understand perhaps where you are violating people's faith or their rights and learn to be very sensitive to the difference between my needs and the patient's needs and to really focus on the patient's needs. (Tr. 93, 94 and 95).[6]

Chaplain Rogers set out the philosophy of CPE as follows:

The philosophy is we do not force your faith understanding on anyone. We do not proselytize, that is a violation of a person who is already in a fairly helpless condition, crisis situation, everything else is already up in the air. So you're very careful not to violate that person's human rights.

You listen very carefully to their story, to their faith language, to the symbols that are important to them, and you help them find the resources of faith and the resources of their life whether that be

---

4. The testimony of Maggie Alzeno Rogers has been transcribed. The balance of the trial has not been transcribed. All references to (Tr.) are references to her testimony.

5. She testified that she did not carry a Bible (Tr. 15), that she had performed no baptisms (Tr. 28), and that she performed no services for

children (Tr. 47) or unconscious patients (Tr. 62).

6. She testified that she had spent five three-month quarters in college, two on basic CPE and three on advanced or residency training (Tr. 93).

family or their church or their faith or their own history, how have I gotten through hard situations before, and help them to find their own strengthening and own courage. To do anything else than that, according to the philosophy of CPE, is unconscionable. (Tr. 97).

Chaplain Rogers further commented on CPE as follows:

Mr. Hartsook: How do you ensure that they do not try to proselytize the patients?

Chaplain Rogers: ... We are trained in the philosophy of pastoral care, which comes out of clinical pastoral care, which is that you do not try to proselytize anyone, but that you listen to the story of that person, you embrace their faith language, and you stick with them. You don't try to lead them anywhere. You can't try to change their ideas or their faith. (Tr. 41).

Chaplain Rogers stated that she and the volunteer chaplains were expected to and did adhere to CPE's concept of not proselytizing patients (Tr. 93–94). She also testified as to her extensive training in grief therapy for patients and their family members.

The services that Chaplain Rogers provides are available to all BMC patients, regardless of their income (Tr. 18) or reason for hospitalization. Her services are not billed directly to the patient. (Tr. 64). Chaplain Rogers and the few volunteer chaplains she supervises have had accress to patients' medical records and admission data. (Tr. 19). This has been done without securing advance approval of patients. "Most of the time when I read a chart, it's at the Sands [psychiatric] Unit where I've been asked to do a consultation and that person [patient] wants to continue to see me, and I want to understand their history a bit better so I can better help them" (Tr. 43), but she says, "I spend very little time reading medical charts." (Tr. 43). She explains that "when I am asked to consult with a patient or his family, I look at the records to get background on them so I can be of better service. If I learn something [about a patient], it is confidential." (Tr.

19). Patients are asked their religious preference when they are admitted to BMC, and their preference is noted on BMC's admission forms. (Tr. 19). Very often the religious preference given is "none", and it is not clear whether that means no denomination, that the patient does not attend church, or that the patient may be an atheist.

Chaplain Rogers encourages the Broadlawns staff and the volunteer chaplains to inform patients of her availability and encourages them to make referrals to her. (Tr. 34). The staff and volunteer chaplains refer her to a patient if they believe that seeing a chaplain would be helpful to the patient, even though no request for a chaplain has been made. Chaplain Rogers attempts to make rounds in the medical section of the hospital every day, but she does not make daily rounds in the psychiatric departments. "Some weeks I don't get over there much at all because I'm busy in the medical section. Other weeks I'll spend maybe 30% to 50% of my time over there." (Tr. 24). "There is also a big need at Sands [psychiatric] so it's a balancing act." (Tr. 47). "I also have a lot of contact with patients who have alcohol and drug abuse problems." (Tr. 67).

Chaplain Rogers makes calls on patients prior to surgery, unless their surgeries begin before 8:00 a.m., the beginning of her work day. These pre-operative calls occur both before and after sedation, even though the patient has made no request to see her. (Tr. 14, 16). When Chaplain Rogers visits a patient, she normally asks if there is anything she can do for the patient. Approximately 40% of the time, the patient's response is to ask her to say a prayer. (Tr. 16). If Chaplain Rogers already knows from a previous visit that prayer is meaningful to a person, she will ask them if she can say a prayer for them.

She summed up some of her activities as follows:

I supply grief counseling, I help them to express their fears, cry, whatever. (Tr. 25).

If I had to guess I would say 20 to 30% of my time is spent in religious activity,

the rest of the time I'm listening to people. (Tr. 53–54).

I focus on the patient's needs.... I have religious discussions only if they lead. (Tr. 21).

If a patient made it clear that he wanted no part of a chaplain, I would honor that. (Tr. 71).

I'm not trying to change their faith. (Tr. 51).

I don't see how anyone could possibly say I'm anything but a servant. (Tr. 52).

It would be terribly hard for me, Maggie, to try to instill my religious beliefs in a patient. (Tr. 60).

I am part of the medical team, the healing team. Chaplain followup is important. (Tr. 68).

In the intensive care and surgery waiting rooms, she often drops in, introduces herself, and gets to know the family to see if there is anything she can do for them. (Tr. 26). These people cannot, under the circumstances—for example, a death-bed watch—leave the hospital to go and seek solace elsewhere. A similar situation arises in intensive care, where family can only go into the patient's room for a fifteen-minute period once every two hours.

I am a liason between the families and the rest of the medical team. Medical doctors and psychiatrists sometimes call on me for consultation ... for instance, when someone is dying there's all kinds of tension. For example, to resuscitate or not ... the doctor asks me to find out what the patient and family think.... Psychiatrists also call on me for consultation ... talk to that patient and get back to me and tell me what you think. I also act as a go between between the patients and their families regarding whether or not they want to be on life support machines for example. (Tr. 33–34).

Although religious discussions are usually not part of her conversations with families, family members sometimes ask her to pray or join them in prayer, which she will do. (Tr. 21).

The Court finds from the testimony of various witnesses and the exhibits that BMC's intent in hiring Maggie Rogers was to enhance the hospital's "wholistic" treatment approach. The record is clear that Chaplain Rogers does perform her duties consistent with the concept of Clinical Pastoral Education (CPE). The explanation of this concept demonstrates that in this setting, the chaplain's function is not the traditional parish- or institutional-style ministry. Rather, its purpose is to address the needs of the individual patient, as defined by the patient, not the chaplain. Proselytization or any effort to impact religion or religious beliefs upon individuals who do not already have such beliefs is totally inconsistent with the CPE concept and is scrupulously avoided by Chaplain Rogers.

Chaplain Rogers also takes her turn with the volunteer chaplains in conducting Sunday services in the Nauraine conference room at BMC. (Tr. 44). This room contains a wooden cross and various hymnals marked with a BMC stamp. The Sunday services are Christian services which include a brief worship service, singing, prayer, reading of Scripture, the chaplain's reflection on the Scripture, and a benediction. The time of the Sunday service is announced over the intercom at the hospital, and only those people wishing to attend do so, usually averaging fifteen to twenty people who are not able to leave BMC to attend outside Sunday services (Tr. 45–46). A parking space is provided near the hospital building for use by volunteer ministers. This space is also available to provide ready access for clergymen, not affiliated with BMC, but who are called in urgent situations. The Court finds no constitutional problems with these two situations. The Court finds that there is a basic need for the services of a chaplain at BMC and that the services provided by the chaplain are permissible under the Free Exercise Clause.

Defendants called as witnesses a strong cross-section of Des Moines area health care professionals. These included Dr. Wooters, Chief Medical Officer of Polk County; Dr. Timothy Olson, Director of Psychiatry at BMC; and Dr. Barry Ingebritson, BMC Medical Director. Donald W.

Dunn, President of the Iowa Hospital Association; Douglas Hart, BMC Trustee Chairman; three other Trustees, and paid chaplains from the Independence (Chaplain Hart) and Clarinda (Chaplain Englehardt) state hospitals also testified. Dr. Ingebritson is the Medical Director for BMC's Primary Care Unit. He opined that as a medical doctor, he is concerned with all health issues, and requires all possible tools to confront them. He believes that a "wholistic" method should be applied to health care. He testified that four health issues must be addressed: (1) social, (2) emotional, (3) spiritual, and (4) bodily. Dr. Ingebritson uses the term "spiritual" rather than "religious" in the sense of belonging to any particular denomination. He testified that a chaplain is needed to treat the "spiritual" aspect, and that a person's health entails much more than mere medicine.

Dr. Timothy Olson is BMC's Director of Psychiatry. He is also the head of the Sidney Sands Unit at BMC. He testified that at any given time, approximately one-third of the Sidney Sands patients are involuntarily committed, without freedom of movement. He further stated that less than 25% of patients residing in the unit at any given point are able to leave the building on a pass. Dr. Olson testified that a full-time chaplain could provide secular and spiritual benefits to Sands (psychiatric) patients. He explained that psychiatric patients often need support benefit from the simple presence of and communication with a chaplain. He did stress the importance of the chaplain's adherence to CPE, noting that psychiatric patients can be very vulnerable to suggestions. He testified that BMC's psychiatric patients are "special," but "they can be very hard to handle; we need an experienced chaplain. Coordination with the doctors is important. We had some trouble with volunteer chaplains. Our problems are similar to Clarinda's, but our patients are sicker, mostly indigent with no family support. The spiritual need is great, so I don't believe psychiatric social workers could do the job."

The consensus of these witnesses was that the chaplaincy was a fine program and that it was badly needed at BMC, not solely for religious services, but more importantly, to assist the doctors in their "wholistic" approach to medical care, and to provide grief therapy for family members.

Donald W. Dunn, President of the Iowa Hospital Association, testified that he was well acquainted with BMC and its mission and service. He said BMC was unique in Iowa, since it has a special charge to provide medical and psychiatric care of the indigent. He testified further that BMC as operated by Polk County was the only county hospital that kept its psychiatric patients for treatment and did not send them to one of the state mental health institutes and that BMC's psychiatric unit operated much the same as the state hospitals in that its needs and mission were the same. Exhibits H, I, J, K, L, N and O each clearly conclude that the Iowa Veterans Home at Marshalltown and the state hospitals at Cherokee, Oakdale, Independence, Clarinda, Mt. Pleasant and Woodward all have tax paid chaplains.

BMC provides long-term, chronic psychiatric service, inpatient (shorter term) and out-patient psychiatric services and serves many chronic alcoholics (Tr. 67) at the detoxification center (Tr. 18). These services make its mission almost identical to Cherokee and the other mental health institutions. BMC, of course, has in addition a busy medical hospital and a pediatric ward. Harold Templeman, the Deputy Director of the Iowa Department of Human Services, testified that he was responsible for the four state mental health facilities and that six chaplains were employed by these facilities. "They are part of our overall team." They provide important service. He further testified that BMC's psychiatric unit is comparable to our four facilities. "Counseling is our main job; the chaplains are a big plus."

The Court was impressed with the four BMC Trustees who testified. They each held responsible positions in the community, had been on the Trustee Board, by election, for a number of years, and were articulate in describing the dire need for the services the chaplain is performing. Board Chairman Douglas Hart, a Service

**1276**

Employees Union official, stated that he had given this situation very careful consideration, that he had been a former State Board member of the Iowa Civil Liberties Union, that he had contacted former counsel for that group and that both were persuaded that there were no real constitutional problems involved in light of the Free Exercise Clause.

Trustee Margaret Stout, an official of the Mental Health Association of Iowa, testified that there must be an ecumenical person available, to follow up, to coordinate. "It's a locked facility; we need a chaplain."

Trustee William Dyar, Director of the Multiple Sclerosis Association of Iowa, stated, "I received many complaints that no ministers were available, that the volunteers who were at times available were too preachy. In my opinion, I am representing the people of Polk County and not just my own views."

Trustee John Ahern, a local real estate man, testified as follows: "We hired the best person available regardless of their faith, but I think it does take an extraordinary person to be able to handle a job such as she does and not carry their own personal feelings (regarding religion) where they shouldn't go, so it takes a real strong person to administer a function like that. We've got a dynamite gal doing it."

Dr. R.C. Wooters, Polk County Chief Medical Examiner (formerly coroner), testified that he had many calls to BMC, that he handles all homicides, suicides and unattended deaths, that he has worked closely with the chaplain. "She is performing an outstanding service; she gives great support to me, the families and everyone involved. I am pleased with the arrangement. I'm not worried about any constitutional problems; this is a necessity."

Each Trustee testified that the hiring of a chaplain was not done to harass or confront Larry Carter; they said it was not in any manner directed to Mr. Carter, and each had complimentary things to say about Carter.

Plaintiff John Doe, now identified as Dr. Maurice LaBelle, is a professor of literature at Drake University in Des Moines, Iowa. He has been a Polk County resident for the past sixteen years. He pays income tax to the State of Iowa and to the United States government. He is an atheist. His definition of an atheist is simply that of a person who does not believe there is a god, deity or supreme being. The presence of a tax-paid chaplain at BMC deters LaBelle from using BMC for medical care and caused him to go to another Des Moines hospital for treatment instead of BMC. LaBelle does not believe that religion should be mixed with medicine and does not want a chaplain to view his medical records. He believes he is entitled to have BMC, a tax-supported hospital, free of religious activity.

Plaintiff Larry Carter is an atheist. He is also the father of Courtney Carter, an 11-year-old minor female. Both Carters have received medical care at BMC in the recent past, and it was their hospital of choice in Des Moines. Larry Carter works only part-time and receives government benefits in the form of Aid to Dependent Children and food stamps. He is normally indigent and unable to pay the entire cost of his medical care. When eligible, Title XIX pays for the Carter's medical care at BMC. When ineligible for Title XIX benefits, he receives free or reduced fee care at BMC. The presence of a government-paid chaplain at BMC is offensive to Carter and makes him unwilling to use BMC for the medical care of himself or his daughter. He is fearful that religion will affect his medical care. Carter is a taxpayer to the State of Iowa and to the United States government. He is a long-time resident of Polk County, and at least a portion of his rent goes to pay property taxes used to support BMC.

As a member of the Citizens Advisory Board for Primary Care at BMC, Carter has taken a public position against the hiring of a chaplain, the use of the conference room for religious services, and the designation of parking spaces for chaplains. The effectiveness of Carter as an Advisory Board member has been affected, he says, by the hiring of the chaplain in that his

personal relationships with the Board of Trustees, other Advisory Board members, and BMC staff have deteriorated.

As a result of Carter's actions in publicly opposing the hiring of a chaplain, his former friends have shunned him. However, he made it clear that the defendants here had not harassed him. He has testified he suffered great anxiety and emotional distress because of his fear that he or his daughter will have to go to BMC for treatment where a tax-funded chaplain is employed. He contends that his part-time employment with a local newspaper was terminated as a result of his activism in seeking to block the employment of a chaplain. The Court makes no finding concerning this contention. The newspaper is not a party to these proceedings.

Carter fears that he will be subjected to religious services at BMC when he is both conscious and unconscious. The Court finds that his fears are unfounded, based on the CPE methods employed by Chaplain Rogers and the volunteer chaplains. The Court specifically finds that there was no competent evidence submitted to persuade the Court that there was and is a conspiracy against atheists and the plaintiffs in relation to this hiring. Atheism and the plaintiffs were clearly not a factor in the hiring. Carter believes that it is "medical malpractice" for BMC to employ a paid chaplain and to allow the chaplain to be a part of the medical team. The Court cannot agree that it is "medical malpractice" to employ the chaplain as she is now employed, and the Court is persuaded that the plaintiffs and all atheists will be safe from any unwanted contact with the chaplain or any of the volunteers.

The Court also heard evidence concerning the finances of BMC. The Court heard the testimony of Gary Uhl, Financial Director of BMC, and received certain financial statements into evidence. The Court finds that there are not sufficient funds donated privately year in and year out to fund the chaplaincy position. Absent private donations that have not been forthcoming, the only methods for funding the chaplaincy program are receipts from patient billings, the cafeteria and tax appropriations, which constitute about one-third of the total. All moneys received are commingled. This Court does not believe it would be appropriate, or solve any constitutional problems, if only money from the cafeteria or patients' billings were used to fund the chaplain position.

## CONCLUSIONS OF LAW

### A. *Jurisdiction.*

This is a civil rights action brought pursuant to 42 U.S.C. §§ 1983 and 1985. The Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1343, and venue is proper under 28 U.S.C. § 1391. BMC is clearly a proper defendant under § 1983. Since limited injunctive relief in favor of the plaintiffs is entered against BMC only, it is not necessary for the Court to determine whether plaintiffs' claims under § 1985 are cognizable.

### B. *Motion to Dismiss—Standing.*

The defendants moved to dismiss, arguing that the plaintiffs did not have standing to maintain this lawsuit. With regard to the standing of plaintiffs to maintain this lawsuit on behalf of others, a stipulation of dismissal was filed on December 27, 1985 by which the American Atheists and Jane Roe dismissed their claims against the defendants. Plaintiff LaBelle has participated as a plaintiff throughout the proceedings, and at the commencement of the trial of this matter, the caption of the case was changed to designate plaintiffs as Larry Henry Carter, Courtney Demaris Carter and Maurice LaBelle. The Carters and Professor LaBelle have standing as taxpayers to challenge the alleged unconstitutional spending of tax moneys in violation of the Establishment Clause of the First Amendment. *Flast v. Cohen*, 392 U.S. 83, 102–05, 88 S.Ct. 1942, 1953–55, 20 L.Ed.2d 947 (1968); *Grand Rapids v. Ball*, 473 U.S. 373, 380 n. 5, 105 S.Ct. 3216, 3221 n. 5, 87 L.Ed.2d 267 (1985). The defendants' motion to dismiss

on the basis of standing is therefore denied.[7]

## C. *Establishment Clause.*

The Establishment and Free Exercise Clauses of the First Amendment to the United States Constitution state:

Congress shall make no law respecting an establishment of religion nor prohibiting the free exercise thereof....

The Establishment Clause applies to the states and their municipalities through the Due Process Clause of the Fourteenth Amendment. *Everson v. Board of Education,* 330 U.S. 1, 8, 67 S.Ct. 504, 508, 91 L.Ed. 711 (1947). The constraints of the Establishment Clause apply to both legislative enactments and other governmental activities. *Voswinkel v. City of Charlotte,* 495 F.Supp. 588, 594 (W.D.N.C.1980); *see also Lynch v. Donnelly,* 465 U.S. 668, 675, 104 S.Ct. 1355, 1360, 79 L.Ed.2d 604 (1984).

The Supreme Court has set forth a three-part analysis utilized in determining whether a government act passes muster under the Establishment Clause. *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971); *Committee for Public Education v. Nyquist,* 413 U.S. 756, 772–73, 93 S.Ct. 2955, 2965, 37 L.Ed.2d 948 (1973). In *Nyquist,* the Supreme Court stated the three-part analysis as follows:

[T]o pass muster under the establishment clause the law in question, first, must reflect a clearly secular legislative purpose, second, must have a primary effect that neither advances nor inhibits religion, and third, must avoid escessive government entanglement with religion.

*Id.* at 773, 93 S.Ct. at 2965 (citations omitted). In construing the Establishment Clause, the Court must strike a balance between the basic mandate of the separation of church and state and the free exercise of religion. In this regard, the Supreme Court has stated:

"It has never been thought either possible or desirable to enforce a regime of total separation." *Committee for Public Education v. Nyquist,* 413 U.S. 756, 760 [93 S.Ct. 2955, 2959, 37 L.Ed.2d 948 (1973). Nor does the Constitution require complete separation of church and state; it affirmatively mandates accommodation, not merely tolerance of all religions, and forbids hostility toward any. *See, e.g., Zorach v. Clauson,* 343 U.S. 306, 314 [72 S.Ct. 679, 684, 96 L.Ed. 954] (1952); *McCollum v. Board of Education,* 333 U.S. 203, 211 [68 S.Ct. 461, 465, 92 L.Ed. 649] (1948). Anything less would require the "callous indifference" we have said was never intended by the establishment clause. *Zorach, supra,* 343 U.S. at 314 [72 S.Ct. at 684]. Instead, we have observed, such hostility would bring us into "war with our national tradition as embodied in the first amendment guarantee of the free exercise of religion." *McCollum, supra,* 333 U.S. at 211, 212 [68 S.Ct. at 465].

*Lynch v. Donnelly,* 465 U.S. 668, 673, 104 S.Ct. 1355, 1359, 79 L.Ed.2d 604 (1984).

This Court applied the *Lemon/Nyquist* test in its order entered September 9, 1985 denying a preliminary injunction. In that order, this Court expressed doubt concerning whether a tax-supported chaplain at a county hospital withstood two of the three *Lemon/Nyquist* elements. (Order of September 9, 1985, pp. 8–9), No. 32 in the Clerk's Memorandum of Papers). As the Court has now fully heard the evidence presented by both sides, further elaboration on the *Lemon/Nyquist* test is in order.

Initially, the Court notes that the *Lemon/Nyquist* test is not a mandatory analysis in Establishment Clause cases. As the Supreme Court noted in *Lynch v. Donnelly, supra,* at 679, 104 S.Ct. at 1362, "We have repeatedly emphasized our unwillingness to be confined to any single test or criterion in this sensitive area." For example, in *Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), the

---

**7.** Plaintiffs offered 56 exhibits. The defendants objected to many of these exhibits as being irrelevant and immaterial. Although the Court believes that some of these exhibits have only limited relevance to the issues involved, the Court rules that all plaintiffs' exhibits, 1 through 56, are admitted.

Supreme Court upheld the State of Nebraska's practice in opening each legislative session with a prayer by a chaplain paid with tax revenues. Rather than employ the *Lemon/Nyquist* test, the Court affirmed this practice relying on a 200–year tradition of commencing legislative sessions with prayer. *Id.* at 792, 103 S.Ct. at 3336. However, in the instant case, the evidence disclosed no such long-time tradition in hiring tax-paid chaplains at *county* hospitals. Therefore, for want of a better analysis, this Court will examine BMC's chaplain utilizing the *Lemon/Nyquist* test.

The first element in this analysis in relation to the Establishment Clause only requires that the practice must reflect a clearly secular purpose. This does not mean that the challenged activities' purpose be exclusively secular. "Were the test that the government must have 'exclusively secular' objectives, much of the conduct and legislation that this court has approved in the past would have been invalidated." *Lynch, supra,* 465 U.S. at 681, 104 S.Ct. at 1363. Thus, the issue is whether BMC's chaplain has a clearly secular purpose.

The Court recognizes that Chaplain Rogers fulfills some secular duties at the hospital, including grief counseling and other secular patient counseling. The Court believes that it is a close question whether her purpose is clearly secular. The principles of CPE appear to indicate that a person's "spiritual needs" do not necessarily mean "religious needs". Also, Chaplain Rogers and the few volunteer chaplains strictly adhere to the CPE concept of non-proselytization. However, after careful consideration of all the evidence and testimony in relation to the Establishment Clause, the Court concludes that the chaplain's position is not clearly secular. One of its main purposes is to meet the religious needs of patients.

The Second Circuit reached a similar conclusion in *Katcoff v. Marsh,* 755 F.2d 223 (2d Cir.1985), where it considered an Establishment Clause challenge to army chaplains:

If the current army chaplaincy *were viewed in isolation,* there could be little doubt that it would fail to meet the *Lemon v. Kurtzman* conditions. Although the ultimate objective of the chaplaincy may be secular in the sense that it seeks to maintain the efficiency of the army by improving the morale of our military personnel, its immediate purpose is to promote religion by making it available, albeit on a voluntary basis, to our armed forces.

*Id.* at 232 (emphasis added). Thus, while the BMC chaplain is available on a voluntary basis and does not proselytize or "push" religion on patients, the immediate purpose is to provide religion to patients who clearly want it.

The Court turns next to the second element of the *Lemon/Nyquist* test, which states that the activity "must have a primary effect that neither advances nor inhibits religion." *Nyquist, supra,* 413 U.S. at 773, 93 S.Ct. at 2965. In *Lynch v. Donnelly,* 465 U.S. 668, 683, 104 S.Ct. 1355, 1364, 79 L.Ed.2d 604 (1984), the Supreme Court noted that its prior decisions clearly recognize that some advancement of religion will necessarily result from governmental action. The issue in the case at bar is whether the chaplaincy provides merely an "incidental advancement" of religion. The Court concludes that it does not. The Court has already found that the BMC chaplain lacks a clearly secular purpose. Paying a chaplain to provide religious care (while not the chaplain's only duty), is an advancement of religion. The fact that Chaplain Rogers abides by CPE concepts makes the advancement more tolerable, but does not eradicate it.

The third element of the *Lemon/Nyquist* test is that the activity must avoid excessive government entanglement with religion. Chaplain Rogers, while she may at times coordinate her hospital rounds with BMC administrators, does not take direction from them as to how she is to counsel patients. Also, her CPE training and her adherence to CPE concepts indicate that the hospital administration would not be required to monitor her every move to ensure that she was not proselytizing

patients. The Court finds that the evidence demonstrates no excessive entanglement.

However, given the fact that BMC's hiring of a chaplain fails two of the three *Lemon/Nyquist* elements, it is clear that the Establishment Clause will only permit the hiring of a paid hospital chaplain if it fits within an exception to its general prohibitions. The Court now considers the issue of whether the hiring is permissible under the Free Exercise Clause.

### D. *Free Exercise Clause.*

As the Second Circuit noted in *Katcoff v. Marsh,* 755 F.2d 223 (2d Cir.1985):

> The establishment clause must in any event be interpreted to accommodate other equally valid provisions of the Constitution, including the free exercise clause, when they are implicated.

*Id.* at 233 (citations omitted). Thus, even though this Court has found that a tax-paid chaplain fails to pass the *Lemon/Nyquist* test, the prohibition embodied in that test is not absolute, and the Court must consider whether the practice is justifiable as an implementation of the Free Exercise Clause.

Although plaintiffs have maintained that this action does not involve the Free Exercise Clause, the Court finds that, factually, the prohibition of a chaplain would directly impact upon the opportunity which BMC patients have to freely exercise their chosen religious beliefs. Initially, it is interest to note that the BMC Board of Trustees requested an opinion from the Polk County Attorney as to the constitutionality of hiring a chaplain. Defendants' Exhibit A is an opinion from the Polk County Attorney informing BMC that it is not unconstitutional to employ a chaplain. The opinion states in part:

> The Trustees are authorized to do all things necessary for management of the Medical Center unless such authority is specifically denied by Chapter 347 of the Code. Nothing in Chapter 347 denies the Medical Center the right to hire a chaplain. The Medical Center is authorized to do so.

(Defendants' Exhibit A). The opinion then mentions the Free Exercise Clause and Article I, § 3, of the Iowa Constitution, which also contains the Free Exercise Clause. The opinion then favorably cites *Rudd v. Ray,* 248 N.W.2d 125 (Iowa 1976), where the Iowa Supreme Court upheld Iowa's practice of paying chaplains to serve the Iowa State Penitentiary. *Id.* at 129.

The situation at BMC is comparable to facts in *Katcoff, supra* at 233, at *Baz v. Walters,* 782 F.2d 701 (7th Cir.1986), and *Rudd v. Ray, supra.* In *Katcoff,* the court upheld the practice of army chaplains, reasoning that as soldiers were often required to live in areas where their own religious denomination was not available to them, to prohibit a chaplain would violate a soldier's right under the Establishment Clause not to have religion inhibited and his right under the Free Exercise Clause to practice his freely chosen religion. *Id.* at 234. In *Baz,* the Seventh Circuit stated that a chaplain may well be necessary at a VA hospital so to accommodate the Free Exercise Clause. 782 F.2d at 709. As previously stated, the Iowa Supreme Court in *Rudd* upheld Iowa's practice of paying chaplains to serve the Iowa State Penitentiary. 248 N.W.2d at 129. The court reasoned that because of the restraints placed on prisoners, a prison chaplain was permissible to guarantee prisoners' free exercise rights. *Id.*

Polk County does not generally "confine" patients at BMC in the same manner as prisoners in penal institutions or as the army assigns its members to particular posts.[8] Plaintiffs contend that hospital patients are not in the same situation as prisoners and that *Rudd* therefore does not apply. Plaintiffs assert that in contrast to prisoners, Broadlawns' patients are not confined by the government and they may leave at any time. While this argument

---

**8.** However, the testimony did demonstrate that at least one-third of the patients in BMC's Sidney Sands unit are involuntarily committed.

has some attraction, it is not grounded in reality.

Few people confined to a hospital may leave at any time. Most patients' mobility is severely restricted due to their health, a condition patients have little control over. Also, BMC psychiatric patients are confined for the most part, and those who are "free" to leave may do so only if they obtain a pass. Further, BMC treats many indigents who have no other hospitalization alternatives. An indigent's freedom to leave the hospital is limited by both his health and his ability to secure medical care elsewhere. Plaintiffs contend that the county could pay for medical services at a private religiously sponsored hospital for those indigent patients who desire religious services. However, this would also result in an indirect contribution to religion and would be fraught with many of the same problems that the plaintiffs now perceive in the hiring of a tax-paid chaplain at BMC. Therefore, the Court finds that the fact that the county government does not place or confine all the patients at BMC[9] has little relevance, and does not ultimately distinguish the facts of this case from the holdings in *Katcoff, Baz* and *Rudd.*

This Court is not only persuaded that the Iowa Supreme Court correctly decided *Rudd,* but that the citation in *Rudd* to Justice Brennan's concurring opinion in *School District of Abington Township v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), expresses the ultimate legal conclusion pertaining to the free exercise interest of patients at BMC:

There are certain practices, conceivably violative of the establishment clause, the striking down of which might seriously interfere with certain religious liberties also protected by the First Amendment. Provision for churches and chaplains at military establishments for those in the armed services may afford one such example. The like provision by state and federal governments for chaplains in penal institutions may afford another example. It is argued that such provisions may be assumed to contravene the establishment clause, yet be sustained on constitutional grounds as necessary to secure to the members of the armed forces and prisoners those rights of worship guaranteed under the free exercise clause.

*Id.* at 296–99, 83 S.Ct. at 1610–12 (footnotes omitted).

██ Therefore, the Court finds that the hiring of a tax-paid chaplain at BMC, like the hiring of a military chaplain or a prison chaplain, is constitutional under the Free Exercise Clause. For similar reasons, the Court concludes that it is also constitutional for BMC to permit religious services and artifacts in the Nauraine conference room and to provide a reserved parking space close to the hospital for visiting ministers as a necessary incident to the provision for a chaplain. Further, the Court finds that there is no constitutional infirmity with either the paid chaplain or volunteer chaplains making patient rounds so long as the principles of CPE are followed. While Maggie Rogers wears a name tag indicating she is the "BMC Chaplain" (Tr. 11) and is referred to by all as a "chaplain," the Court finds that the title in and of itself is not objectionable. She is not the stereotype of one's usual image of a "chaplain." She is an unordained female who does not view her primary focus as religious. The Court finds that what her title is does not automatically foreclose her from acting by constitutional edict. The Court also finds that the use of name tags which identify the chaplains are not a constitutional violation. Restrictions on the voluntary wearing of identification tags by hospital chaplains could implicate First Amendment free speech protection. *See, e.g., Tinker v. Des Moines School Dist.,* 393 U.S. 503, 505–06, 89 S.Ct. 733, 735–36, 21 L.Ed.2d 731 (1969). The Court also finds that the religious preference question on BMC's admission forms is permissible, as long as religious preference is not a prerequisite to admission.

---

**9.** Polk County sends both occasional prisoners, alcoholics and those with medical and mental both long- and short-term problems to BMC. Others are referred by physicians or just show up for admittance.

The evidence clearly demonstrates that it was not.

While the Court finds that the BMC chaplain is constitutional under the Free Exercise Clause, the chaplain's activities should not be unrestricted. The Seventh Circuit in *Baz v. Walters, supra,* addressed the constitutional tightrope such as the one on which BMC has embarked:

[T]he VA must ensure that the existence of a chaplaincy does not create establishment clause problems. Unleashing a government-paid chaplain who sees his primary role as proselytizing upon a captive audience of patients could do exactly that. The VA has established rules and regulations to ensure that those patients who do not wish to entertain a chaplain's ministry need not be exposed to it.

782 F.2d at 709. Chaplain Rogers abides by the principles of CPE as outlined in this Court's Findings of Fact. She has not assumed the role of proselytizing, and BMC should not allow it. The Court concludes that a government-paid chaplain at BMC who used coercive methods to forcefully expose patients to religious doctrine would contravene the Establishment Clause, *Baz, supra,* 782 F.2d at 709, and would contravene the Free Exercise Clause. *Campbell v. Cauthron,* 623 F.2d 503, 509 (8th Cir. 1980). Since the employment of a paid hospital chaplain abiding by the CPE principles explained at trial is consistent with ensuring a patient's free exercise interests, the Court concludes that it is not unconstitutional for BMC to employ a chaplain who performs as Maggie Alzeno Rogers does at BMC.

This decision, however, is limited to providing religious and grief counseling service to inpatients only. She may provide grief counseling services to families that are at the hospital and for all practical purposes not free to leave because a loved one is in a life-death situation. Chaplain Rogers testified that some of her religious counsel was extended to employees (Tr. 29), families of patients, and outpatients.[10] The

Free Exercise interests of these three classifications—employees, families (exclusive of those mentioned above) and outpatients—are not implicated since they are free to leave the institution and procure religious counsel elsewhere. *See, e.g., Voswinkel, supra,* 495 F.Supp. 588. Thus, relief for the defendants is granted subject to a restriction against the chaplain's providing religious counsel to employees, patients' families (except as set out above) and outpatients.

The Court also concludes that the policy of chaplains having open access to patient medical records is constitutionally infirm under the Fourteenth Amendment. Patients at BMC have a right of privacy founded on the Fourteenth Amendment's concept of personal liberty. *Whalen v. Roe,* 429 U.S. 589, 599 n. 23, 97 S.Ct. 869, 876 n. 23, 51 L.Ed.2d 64 (1977), *citing Roe v. Wade,* 410 U.S. 113, 152–53, 93 S.Ct. 705, 726–27, 35 L.Ed.2d 147 (1973). One facet of the right of privacy "is the right of an individual not to have his private affairs made public by the government." *Whalen, supra,* 429 U.S. at 599 n. 24, 97 S.Ct. at 876 n. 24, *quoting* Kurland, *The Private I,* The University of Chicago Magazine 7, 8 (Autumn 1976). In *Planned Parenthood v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), the Supreme Court refused to strike down record-keeping and reporting requirements regarding abortions that were (1) reasonably directed to the preservation of maternal health and which (2) properly respect a patient's confidentiality and privacy. *Id.* at 80, 96 S.Ct. at 2846. In allowing chaplains free access to medical records, BMC is not properly respecting a patient's confidentiality and privacy. The Court concludes that patient medical records can only be accessed by a chaplain upon prior express approval of the individual patient or his guardian. This will not be so broad as to bar doctors, medical and psychiatric professionals and nurses to provide to the chaplain basic information, not privileged, which would en-

---

10. This counseling now relates in part, at least to the duties of these employees in life-or-death situations with all the stress and grief involved therein. Thus, as much as it may be desirable, it cannot be allowed in this setting.

able the chaplain to understand what the patient's basic problem was, e.g., a suicide attempt. The Court shall enter injunctive relief regarding this violation. However, the plaintiffs have not shown that their privacy rights have been personally violated in this regard and, thus, the Court will not award any damages.

## CONCLUSION

This order should not be read as setting a general precedent for the hiring of paid chaplains in state or county institutions. Each such situation must be determined on its particular facts.[11] The result here is limited only to a situation such as exists at BMC. The factors the Court has specifically relied on in permitting the hiring of a chaplain are as follows. BMC has a relatively large psychiatric patient population which is essentially "locked down." This population includes involuntary commitments. In general, the psychiatric population is not free to leave to procure religious counseling or services elsewhere. This is also true of alcoholics and patients in the chemical dependency unit and occasional prisoners sent to BMC. The medical patients at Broadlawns are generally unable to procure religious service elsewhere due to their health. Patients at BMC are in large measure indigent and generally unable to procure treatment at some other institution that has religious facilities. The non-proselytizing principles of CPE are followed by the BMC chaplain. There has been a demonstrated demand for "wholistic" health care involving the social, emotional, spiritual and bodily well-being of the patients that has not reasonably been met by the volunteer service of chaplains, despite repeated efforts toward securing volunteers. The Court therefore concludes that the hiring of a chaplain is constitutional under the Free Exercise Clause.

IT IS THEREFORE ORDERED that plaintiffs' prayers for declaratory and injunctive relief regarding the hiring and continued employment of a paid chaplain at Broadlawns Medical Center are hereby denied.

IT IS FURTHER ORDERED that Chaplain Maggie Rogers and any successor to her as paid chaplain at Broadlawns Medical Center are enjoined from counseling of employees, families of patients where the patient is not in a life-death situation, and outpatients.

IT IS FURTHER ORDERED that Broadlawns Medical Center is hereby enjoined from permitting chaplains' access to patient medical records absent express consent from the patient, his or her guardian or next of kin.

IT IS FURTHER ORDERED that plaintiffs' prayer for an award of compensatory damages is hereby denied.

IT IS FURTHER ORDERED that counsel for the plaintiffs shall submit a short brief within fifteen days concerning whether plaintiffs are entitled to an award of attorney fees as a partially prevailing party on some of the issues set out herein pursuant to *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The brief shall be accompanied by an affidavit itemizing the time spent on this case and an hourly rate reasonable for the community. Counsel for defendants shall file a reply brief within fourteen days from the date of the filing of plaintiffs' brief.

---

**11.** This decision should not be read as a finding that publicly owned hospitals are required by the Constitution to provide chaplains to patients. Although the Court holds that BMC's use of a chaplain is permissible as a means of ensuring patients' free exercise rights, a different question would be posed if the hospital did not have a paid chaplain and a patient sued to compel the hospital to provide one. The fact that a right is constitutionally protected does not automatically authorize the Court to compel governments to remove obstacles to the full exercise of that right. *Harris v. McRae,* 448 U.S. 297, 316, 100 S.Ct. 2671, 2688, 65 L.Ed.2d 784 (1980); *Rudd v. Ray, supra,* at 133.